1                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3

4   IN RE:                    )   BK. NO: 08-30331-SGJ-7

5                             )

6   JAMES EUGENE RIGGERT      )

7        D E B T O R          )

8   _____

9                                ADV. NO: 08-3165

10

11            *   *   *   *   *   *   *   *   *   *   *

12

13                   TRANSCRIPT OF PROCEEDINGS

14

15            *   *   *   *   *   *   *   *   *   *   *

16

17

18

19

20           BE IT REMEMBERD, that on the 20th day of May, 2009,

21   before the HONORABLE STACEY G. JERNIGAN, united States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                    A P P E A R A N C E S

2    BARTHOLOW & BARTHOLOW
     11300 N. Central Expressway, Suite 301
3    Dallas, Texas 75243
           BY:  Ms. Molly Bartholow
4
                         APPEARING ON BEHALF OF THE DEBTOR
5
     ERNEST LAUN
6    Attorney at Law
     4245 North Central Expressway, Suite 350
7    Dallas, Texas  75205

8                         APPEARING ON BEHALF OF THE CADLE COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3  Appearances                                       2
   Exhibit Index                                     4

4
   <u>JAMES RIGGERT</u>

5
        DIRECT EXAMINATION
6            BY:  Mr. Laun                           20
             BY:  Ms. Bartholow                      62
7       CROSS-EXAMINATION
             BY:  Ms. Bartholow                      44
8            BY:  Mr. Laun                           66
        REDIRECT EXAMINATION
9            BY:  Mr. Laun                           53
             BY:  Ms. Bartholow                      69
10
   <u>LISA RIGGERT</u>

11
        DIRECT EXAMINATION
12           BY: Ms. Bartholow                       74

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>E X H I B I T   I N D E X</u>

|  | | <u>PAGE FIRST REFERENCED</u> |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | Exhibit Number 1 | 22 |
| 4 | Exhibit Number 2 | 55 |
| 5 | Exhibit Number 3 | 55 |
| 6 | Exhibit Number 4 | 56 |
| 7 | Exhibit Number 5 | 37 |
| 8 | Exhibit Number 6 | 38 |
| 9 | Exhibit Number 7 | 20 |
| 10 | Exhibit Number 8 | 20 |
| 11 | Exhibit Number 9 | 28 |
| 12 | Exhibit Number 10 | 30 |
| 13 | Exhibit Number 11 | 41 |
| 14 | Exhibit Number 12 | 38 |
| 15 | Exhibit Number 16 | 59 |
| 16 | Exhibit Number 19 | 36 |
| 17 | Exhibit Number 20 | 37 |
| 18 | Exhibit Number 21 | 37 |
| 19 | Exhibit D-D | 69 |
| 20 | Exhibit D-E | 75 |
| 21 | Exhibit D-F | 80 |

22

23

24

25

1                P R O C E E D I N G S

2                THE COURT:  All right.  The Court is ready to

3    begin the trial in the Cadle Company v. Riggert, adversary

4    08-3165.

5         Let's start by getting appearances from counsel.

6                MR. LAUN:  Ernest Laun for the plaintiff, Your

7    Honor.

8                THE COURT:  Good morning.

9                MS. BARTHOLOW:  Molly Bartholow for

10   Mr. Riggert.

11               THE COURT:  Good morning.

12               MS. BARTHOLOW:  Your Honor, one -- probably

13   good news for you.  The Riggert's daughter has a school

14   function at 2:00 that they would like to attend.  We're going

15   to make an effort to try to complete today before 2:00,

16   preferably by 1:30 at the latest.

17        I've spoken with Mr. Laun.  We both have requested

18   attorney's fees.  And what I think we've agreed to do is

19   allow the Court to rule on merits and then whoever is the

20   successful party will exchange affidavits --

21               THE COURT:  Okay.

22               MS. BARTHOLOW:  -- and briefs on the ability

23   to get attorney's fees and what they are.  And try to work

24   those out.

25               THE COURT:  Okay.  Very good.

          1              THE COURT:  Are we going to have just two

          2  witnesses today or --

          3              MR. LAUN:  I'm calling one witness, Your

          4  Honor.

          5              THE COURT:  There's one other person.

          6              MR. LAUN:  But I'm just calling Mr. Riggert.

          7              THE COURT:  Oh, okay.  Okay.  Well, that

          8  certainly seems achievable, then.

          9              MS. BARTHOLOW:  I think so.

         10              THE COURT:  We'll do everything we can to

         11  speed it along.

         12              MS. BARTHOLOW:  Move it right along.

         13              THE COURT:  All right.  Mr. Laun, any

         14  housekeeping matters or comments about that?

         15              MR. LAUN:  As a preliminary matter, we did

         16  file our exhibits timely and there were no objections timely

         17  filed.  So we would move to admit Plaintiff's Exhibits 1

         18  through 24.

         19              THE COURT:  Okay.  Is that the blue notebook I

         20  have up here?

         21              MR. LAUN:  Yes, Your Honor.

         22              THE COURT:  All right.  Ms. Bartholow, any

         23  objection with that?

         24              MS. BARTHOLOW: Well, I do, Your Honor, because

         25  Mr. Savet is not here for me to cross-examine.  I thought he

would be here.  He did have his affidavit, but I thought he

was going to be here for me to cross-examine.

THE COURT:  All right.  Well, let's see.  We

have our rule under our scheduling order that objections to

exhibits are due, what is it, seven days before trial docket

call, or they are deemed waived except with respect to

objections as to relevance or privilege, for that matter.

So, Ms. Bartholow, what do you have to say about that?  I

didn't see an objection on file as to these exhibits.

MS. BARTHOLOW:  Your Honor, perhaps I

misunderstood.  Again, the documents, not the problem if I

have a witness to cross-examine.  And it wasn't apparent to

me that I would have no opportunity to cross-examine

Mr. Savet.  What I -- what I thought I was required to object

to were the statements in the affidavit, not my ability to

cross-examine on the statements or the authenticity of the

documents he had attached to his affidavit.  If I was

mistaken, I was mistaken.

I do need to make this a learning process.  So if it is

the Court's intent that if I choose not to object to the

affidavit itself I must subpoena the witness to

cross-examine, then I need to just make this a learning

process and learn that.  But that wasn't evident to me.

THE COURT:  I'm going to double check the

exact wording of our scheduling order.

1          MS. BARTHOLOW:  Your Honor, we had a special

2  order the Court entered.

3          THE COURT:  Okay.  You all did your own

4  scheduling order?

5          MR. LAUN:  The Court entered one on February

6  24th, Your Honor, which contained the directive that

7  objections to exhibits shall be filed no later than March

8  13th.  The exhibit that's complained of is a business record

9  affidavit that certainly could have been complained of.

10          THE COURT:  Okay.  So you're saying you have

11  P-18 here which was the affidavit of the Cadle representative

12  with regard to all of these other documents.

13          MR. LAUN:  It authenticates Exhibits 19

14  through 21.

15          THE COURT:  Okay.  The agreed judgment, the

16  assignment of judgment, okay.  I got you.  Okay.  Let me look

17  at our scheduling order.

18      All objections to exhibits shall be filed no later than

19  March 13th.  Okay.

20      All right.  That's what I thought.  I think our

21  standard form of scheduling order that we default to in

22  adversaries in this District is a little clearer on the point

23  than the February scheduling order that the parties

24  submitted.  It explicitly says -- our standard default form

25  of scheduling order in this District explicitly says, All

1  exhibits not objected to in writing by docket call shall be

2  admitted into evidence at trial with out further proof,

3  except for objections to relevance.  So, again, the standard

4  form of scheduling order we default to I think makes clear

5  that he wouldn't have to have a witness to prove up and get

6  into evidence the documentary evidence.  However, he would be

7  at risk still of a relevance objection.  And, you know,

8  without a witness to show the relevance or compelling

9  argument, it might be kept out of evidence if the relevance

10 objection was sustained.  So --

11          MS. BARTHOLOW:  May I make an additional

12 objection?

13          THE COURT:  You may.

14          MS. BARTHOLOW:  Thank you, Your Honor.  It

15 will take just a moment to turn to the affidavit.

16     Okay.  The affidavit is item 18, Exhibit 18.

17          THE COURT:  Okay.

18          MS. BARTHOLOW:  And then attached separately

19 behind there are a number of documents.  Now, I want to

20 preserve the objection because they are not specifically

21 designated as the documents that are being referred to in the

22 affidavit.  We had previous objection because there was no

23 authentication, in my opinion, as to the documents that were

24 referred to.  And I requested that they get some.  Well,

25 instead what they did was they separately listed each one of

1  the documents, but provided no additional authentication than

2  the affidavit that they originally put in.

3       So, again, what we have is Number 18 with no documents

4  attached.  Then we have 19, 20, 21, 22, 23, 24, whatever

5  documents that are -- there's no real connection between the

6  affidavit itself and the document attached.  And so if we're

7  going to admit one and admit the others, I understand that.

8  But I don't think we can say the affidavit, in fact, includes

9  these other documents.  There's just an affidavit of Nate

10 Savet.

11            THE COURT:  All right.  Understood.

12       Mr. Laun, is it your representation as Cadle's counsel

13 that items Number 19, 20, and 21 are, in fact, the items that

14 are referred to in this affidavit?

15            MR. LAUN:  Yes, Your Honor.

16            THE COURT:  And you have just separated them

17 out, or what?

18            MR. LAUN:  The reason I separated them out is

19 at the hearing that was held that resulted in the February

20 24th order on the motions and the resetting the trial, I was

21 specifically chastised by counsel that she did not understand

22 which -- that I needed to separately identify each and every

23 exhibit.  We have painstakingly done that.  Each item is

24 separated listed and described and each item is tabbed and

25 marked with a specific exhibit number.  We've gone to

1 extraordinary lengths to describe exactly what the exhibits
2 are.  And these -- that's why we separated them out, because
3 I thought I was under a directive in this order that shall be
4 so detailed -- I should describe each exhibit to be offered
5 into evidence.  Now, the business record affidavit is a
6 standard affidavit used in federal court.  Typically
7 everybody knows you have to file a written objection to a
8 business record affidavit if you think that there's some
9 defect in them.  There was no objection filed.  And I really
10 don't think this is material in as much as the debt that's
11 described in Exhibit 18, 19, 20, and 21 is the same debt
12 that's listed by the debtor on the schedules and not marked
13 contingent, unliquidated, or disputed.  So the idea that
14 we're having a dispute about whether or not a debt exists and
15 is owned by the Cadle Company when the defendant himself has
16 admitted it in the schedules under penalty of perjury doesn't
17 seem like we're focused on what the issue is.  And I don't
18 think there's any basis for an objection to exclude the
19 business record affidavit, Your Honor.
20          THE COURT:  Okay.  I do overrule the objection
21 and I am going to admit Exhibits 1 through 24 here today,
22 Cadle Plaintiff's Exhibits 1 through 24.
23     All right.  Any other housekeeping matters before we
24 begin the trial?
25          MS. BARTHOLOW:  Your Honor, I guess we would

1    also request that our Exhibit D-A through D-F also be

2    admitted as no objection, since none were previously raised.

3         May I approach?

4              THE COURT:  You may.

5         Mr. Laun?

6              MR. LAUN:  No, I did not file an objection and

7    have no objection to the admission, Your Honor.

8              THE COURT:  All right.  Exhibits D-A through

9    D-F will likewise be admitted.

10             MS. BARTHOLOW:  I will represent to the Court

11   that Exhibit D-B is the docket sheet for the case, the main

12   case and that I have not specifically labeled any document

13   D-C.

14             THE COURT:  Okay.  So there is no D-C.  And

15   I'm sorry, which -- you said D-B or D-D?

16             MS. BARTHOLOW:  Yes.  D-B as in boy is the

17   docket sheet.  My general statement of what D-B would be is

18   any document or pleading filed in the adversary or main case.

19             THE COURT:  Okay.

20             MS. BARTHOLOW:  And what I've done is -- I'm

21   basically asking the Court to take judicial notice of the

22   docket sheet in the main case.

23             THE COURT:  Okay.  Any comment from you,

24   Mr. Laun, on that?

25             MR. LAUN:  No, Your Honor.  No problem.

         1              THE COURT:  Okay.  The Court will so take

         2    judicial notice.

         3         All right.  I will take opening statements at this

         4    time.

         5         Mr. Laun, you may make your's first.

         6              MR. LAUN:  May it please the Court.  The Court

         7    is well versed in matters of objections to discharge.  We're

         8    limiting our objection today at this trial to 727(a)(4) and

         9    727(a)(2)(A).

        10              THE COURT:  All right.

        11              MR. LAUN:  What I've got to prove today is

        12    that Mr. Riggert made a statement under oath.  The statement

        13    was false.  He knew it was false at the time he made it.  It

        14    was done with a fraudulent intent to deceive.  And the

        15    statement related to the materiality of the bankruptcy case.

        16         With respect to the 727(a)(2)(A) claims, I have to

        17    prove a transfer or concealment of property belonging to the

        18    debtor within one year of the filing with the intent to

        19    hinder, delay, or defraud the creditors of the estate.

        20         Your Honor, we believe the evidence will show that.

        21              THE COURT:  Thank you, Mr. Laun.

        22         Ms. Bartholow.

        23              MS. BARTHOLOW:  As Mr. Laun stated and during

        24    our preparation for the hearing today it is -- it is apparent

        25    that you've written a number of opinions on Cadle Company

motions to object to discharge, whether it's 523 or 727.  So
I know the Court is aware.  Of particular interest to me was
the Hughes case in 2006 where you discussed an issue that I
think is similar to what we have here.  In one of the prior
hearings the Court asked us to focus on materiality.  And in
that regard on page A-11 and A-12 of your Hughes decision,
which is 354 B.R. 801 and then 811 and 812, you focused on
the elements of (a)(4)(A), 727(a)(4)(A).  And materiality is
one of the elements.

What is interesting about materiality is that it's not
necessarily the amount of the claim in question or the item
in question that's relevant, but question of whether the
subject matter or the false oath bears a relationship to the
debtor's business transactions or estate, or concerning the
discovery of assets, business dealings, or the existence and
disposition of this property.

I would also point the Court to the 5th Circuit's
opinion in Pratt, which is at 411 F.3d 561.  Pratt is another
case that also discusses all of these issues, picks up the
same language, and eventually ruled that the alleged
non-disclosure in the Pratt case dealt with children's trust.
And the Court said, Nevertheless, we conclude that Pratt's
failure to list his Trustee status, assuming it got decided
it was required, is not material because this knowledge would
not assist Pratt's creditors.  And I think that's the crux of

1    what the Court is going to decide here today.

2         It's the position of Mr. and Mrs. Riggert that, number

3    one, this particular plaintiff was fully aware of all of the

4    intricate details of the refinancing of their home.  No

5    question they refinanced their home at the end of June, early

6    July.  Countrywide is the new lender.  We don't dispute that.

7    I don't think it's disputed that Mrs. Riggert took out that

8    loan.  I don't think it's disputed that monies were paid by

9    Countrywide to Ms. Riggert.

10        So having said all of that, the question is, was there

11   a transfer, A, of anything belonging to Mr. Riggert?  And

12   it's our position that what occurred there was Mrs. Riggert

13   took some of her property interest in that property out.

14   Mr. Riggert's position, vis-a-vis the home, was exactly the

15   same before and after this financing.  That there was no

16   transfer of his interest in the property.  In fact, as a

17   result of the agreement between the parties, he gets the

18   first 68,000 of equity out of the house.

19        So we're saying Mr. Riggert's interest was unaffected

20   by the agreement between the parties and his creditors were

21   not affected at all.  Because we're talking about a

22   homestead.  And part of the reason for introducing the docket

23   sheet is for the Court to take notice that nobody has

24   objected to the homestead exemption of the home.  So one of

25   the things that I think we can all agree on is their home is

1  their homestead.  It was at the time they refinanced.  It is

2  now.

3      So I don't get why this is something that, A, needed to

4  be disclosed on the schedules.  And, B, wasn't sufficiently

5  disclosed.  And, C, was material.  So we -- we will tell the

6  Court the word "the agreement" and the description of the

7  agreement between the parties isn't on the schedules.  We

8  will admit to that.  But the transaction itself was.

9      The schedules are going to show that we listed the

10  home.  We listed the home subject to a lien.  We listed the

11  debt.  Countrywide is on there with a secured claim for the

12  amount of the refinanced amount in June.  We listed in the

13  statement of affairs the fact that Cadle Company got $5,000

14  out of that at closing.  So the transaction itself, I think,

15  is adequately disclosed.  The issue then becomes whether the

16  agreement between the parties is a material thing that should

17  have been disclosed, or was something that is required to be

18  disclosed at all.

19      And the other fact that I want the Court to be fully

20  aware of were the efforts by the debtor to keep the Cadle

21  Company informed of what was going on.  I think it will be

22  undisputed, has been undisputed today that the Cadle Company

23  got $5,000 out of the refinancing.  So they definitely knew

24  about the refinancing.  They were on -- we're going to show

25  they were on the closing statement, Received the money.  No

1   question about it.  No question but Mr. Riggert had his

2   deposition taken by Cadle Company shortly after that

3   transaction and that the transaction was discussed fully.

4       Also, there's no dispute that the Cadle Company was

5   given a copy of the agreement when it was filed of record.

6   That I don't think is disputed either.   I believe the

7   testimony will show that they got a copy of the agreement in

8   about November.  This case wasn't filed until January.  So

9   the Cadle Company knew of the agreement from November to

10  January and didn't do anything.

11      At the 341 Meeting the Cadle Company appeared and

12  questioned Mr. Riggert about both the agreement and the

13  refinancing.  It was discussed, it wasn't not disclosed.  It

14  was disclosed and it was discussed.

15      I think we're very surprised at the position that the

16  Cadle Company is taking because there was an extra effort

17  with regard to them to keep them informed of what occurred.

18  They knew that they had gotten the closing documents from the

19  title company from the refinancing.  They knew that the money

20  from the closing of the refinancing went to Mrs. Riggert, did

21  not go to Mr. Riggert.  Went to her.  I think it's undisputed

22  that she doesn't owe the Cadle Company anything.  Our

23  argument is also Mr. Riggert doesn't owe the Cadle Company.

24  But we'll get into those specifics I think at closing.

25      But even if they owed -- Mr. Riggert owed something to

1  the Cadle Company, Mrs. Riggert didn't.  And so at the end,

2  it's not material that she got some of the equity out of the

3  exempt home, because it wasn't available for his creditors.

4      The Northern District has taken a couple of

5  opportunities to talk about sole community and separate

6  property of the non-filing spouse.  It came up in Judge

7  Houser's opinion in Trammel.  And I'll give the Court that

8  citation a little later.  And also Judge Lynn had an

9  opportunity to talk about it in the Nayhat case.  And that

10  was prior to the current Bankruptcy Code.  But the concept of

11  Texas law overlay on bankruptcy and the fact that there are

12  rights of the non-filing spouse that are separate and apart

13  from the rights of the debtor are pretty evident.

14      The Trammel case is particularly interesting because in

15  that case a car creditor was trying to get permission to

16  foreclose on a vehicle.  In this case the spouse was the wife

17  that filed.  The husband had bought the car.  He had signed

18  all of the documents.  He signed the security agreement.  But

19  the wife was driving the car every day.  His testimony he

20  bought the car for her.  And, yet, Judge Houser ruled that

21  the vehicle itself wasn't property of the estate because it

22  wasn't under the wife's sole management and control.  And

23  that was the ruling of the Court.  So the Court ruled there

24  was no stay to lift because this vehicle was property of the

25  husband who didn't file and it's under his sole management

1   and control regardless of the use of the car by the wife.  So

2   you don't need to lift the stay, go foreclose on the car.

3          To me that's a very extreme case, but it is a reported

4   decision of this District.  And if it just emphasizes there

5   are distinct stays.  And if a spouse is property owner, their

6   sole management is not property of the estate then clearly

7   whether -- if there needs to be a detailed explanation in the

8   schedules beyond what we've already done.  Nobody is trying

9   to hide the fact that there is a refinancing or the value of

10  it.

11         So I think that's where we're headed today.  Again, we

12  will try to move promptly so we can finish early.

13             THE COURT:  All right.  Thank you.

14  Mr. Laun, you may call your first witness.

15             MR. LAUN:  James Riggert.

16             THE COURT:  All right.  Mr. Riggert, if you

17  could come up before our court reporter first, she's going to

18  swear you in.  And then after she swears you in, you'll take

19  the witness stand over there.

20             (The witness was sworn by the courtroom deputy.)

21             MR. LAUN:  Your Honor, may I approach the

22  witness with the exhibit binder?

23             THE COURT:  You may.

24

25             (no omission)

1                          JAMES RIGGERT

2     The witness, having been duly sworn to tell the truth,

3     testified on his oath as follows:

4                       DIRECT EXAMINATION

5     BY MR. LAUN:

6          Q.   Would you state your name, please?

7          A.   James Riggert.

8          Q.   Are you one in the same James Eugene Riggert who

9     filed bankruptcy on January 31, 2008?

10         A.   Yes, sir.

11         Q.   All right.  And you're the defendant in this

12    adversary proceeding?

13         A.   Yes, sir.

14         Q.   Would you mind turning to Exhibit Number 7 in the

15    exhibit volume?

16         A.   Yes, sir.

17         Q.   This Schedule A of real property, that's true and

18    correct?

19         A.   Homestead 6622 Northport, Dallas, Texas, fee

20    simple.  Yes.

21         Q.   All right.  And that was true and correct on the

22    day you filed and today?

23         A.   Yes.

24         Q.   Let me direct your attention to Exhibit 8.

25          Would you take a moment to look at those schedules, the

 1   Schedule 8 and tell me if those schedules were true and

 2   correct on the date that you filed?

 3       A.   The only comment that I have, Mr. Laun, is that

 4   item 25, automobiles, trucks, trailers, and other vehicles

 5   and accessories --

 6       Q.   Yes.

 7       A.   It mentions my Jeep Grand Cherokee Loredo and then

 8   it says 6622 Northport.  And under item 31, animals, it says

 9   two pets and then it says my home address.

10       Q.   Okay.  Is there something wrong with that?

11       A.   Just don't want my homestead to be referred to as

12   animals or be misconstrued that my Jeep is my -- or my

13   homestead is also an automobile.

14       Q.   I trust we all understand that.

15        Let me ask you to direct your attention to Exhibit 1

16   now.

17        Exhibit 8, the Schedule B of personal property, other

18   than the comment that you made, it's true and correct?

19       A.   I'm sorry, Mr. Laun, I'm not there yet.

20       Q.   I'm sorry.

21       A.   Yes, sir.  Ask the question again.

22       Q.   Okay.  Exhibit 8, that's Schedule B.  That's true

23   and correct on the date you filed and it's true and correct

24   today?  Item number 8, I'm sorry, I'm confusing you.

25                 MS. BARTHOLOW:  Your Honor, as to Exhibit 8, I

1    think this is asked and answered already.

2              THE COURT:  I will sustain.  He pointed out

3    the address and clarification about that.

4              MR. LAUN:  All right.  I apologize.

5         Q.   Let me ask you to turn to Exhibit 1 now.

6          And what is Exhibit 1?

7         A.   Homestead refinancing agreement.

8         Q.   And is that your signature on page 3 of the

9    agreement?

10        A.   Yes, sir.

11        Q.   You recognize your spouse's signature?

12        A.   Yes, sir.

13        Q.   All right.  And what was the purpose of this

14   homestead refinancing agreement?

15        A.   To clarify in writing what our agreement was on the

16   refinancing of the house with the proceeds being my wife's

17   sole and separate property.

18        Q.   Was there some doubt about that prior to executing

19   the agreement?

20        A.   Just wanted to make it in the deed records.

21        Q.   Doesn't the agreement also provide that you're to

22   be reimbursed a certain sum of money?

23        A.   No, sir.

24        Q.   It doesn't provide that?

25        A.   It talks about reimbursement if there's a

1   deficiency or if there are payments made by me.

2       Q.   So you do get some money out of this agreement

3   under certain contingencies?

4       Well, let me direct your attention to paragraph 4 on

5   page 2.

6       A.   Yes, sir.

7       Q.   The first sentence says that you will receive

8   65,864 from the gross sales proceeds of a sale of the

9   property?

10      A.   It says in the event the gross sales proceeds from

11  the sale are not sufficient to pay the husband, the 65,864.49

12  specified in paragraph 3(iii), above any deficiency shall be

13  deemed to constitute an unsecured loan from husband from his

14  sole and separate property.

15      Q.   Okay.  And such loan shall be repaid by wife, does

16  it go on and say that?

17      A.   In the event?

18      Q.   Yes, that's correct.

19      A.   Let me see.

20      I would call that a contingent liability of your wife.

21  I'd say it's in the event of, a hypothetical when.  In the

22  event that there would be a deficiency.

23      Q.   Your wife is going to pay you a certain sum of

24  money?

25      A.   Yes, in the event.

1    Q.   So this is a promise by your wife to pay you

2  $65,000 in the event certain contingencies occur?

3    A.   In the event the gross sales proceeds from a sale

4  are not sufficient to pay.

5    Q.   All right.  Did you consider this an account

6  receivable?

7    A.   No.

8    Q.   Okay.  Let me ask you to direct your attention to

9  Exhibit 8 again, question number 18.

10   A.   Yes, sir.

11   Q.   Did you have any other liquidated debts owed to

12  you, give particulars?

13   A.   No.

14   Q.   So your wife's $65,000 debt to you was not listed

15  in response to question 18?

16   A.   It's not -- there was no signed document as a

17  promissory note.

18   Q.   You don't consider Exhibit 1, the home financing

19  agreement, a promise to pay you $65,000?

20   A.   No, sir.

21   Q.   So is Exhibit A -- is Exhibit 1 unenforceable

22  against your wife with respect to the 65,000?

23   A.   I'm not an attorney, Mr. Laun.  I'd have to ask my

24  counsel about that.

25   Q.   Did you intend the document, Exhibit 1, to be

1 enforceable against your wife and your wife to enforce it

2 against you?

3      A.   Restate that, please.

4      Q.   Did you intend Exhibit 1 to be enforceable against

5 yourself and enforceable against your wife?

6      A.   The lawyer who drafted this put that language in

7 there.  Our intent was to identify the separate property from

8 the proceeds.

9      Q.   So you don't really consider the agreement stated

10 in paragraph 4 of Exhibit 1 to be enforceable against your

11 wife?

12      A.   I'd have to ask a lawyer about that.

13      Q.   You're a real estate agent?

14      A.   Yes, sir.

15      Q.   And you have a license from the Texas Real Estate

16 Commission?

17      A.   Yes, sir.

18      Q.   You've had some training in contracts; have you

19 not?

20      A.   I do have to take some, but when I fill out a

21 contract of sale, Mr. Laun, it clearly states in the contract

22 that I am not a lawyer and I'm not giving anybody legal

23 advice.  In fact, I'm prohibited from giving anybody legal

24 advice.

25      Q.   You've signed a mortgage before, haven't you, a

1  promissory note?

2      A.   Yes, sir.

3      Q.   Is that a promise to pay, or is that a legal

4  question?

5      A.   I'd have to have my attorney review the documents.

6      Q.   All right.  Let me direct your attention to number

7  21 on Schedule B, that would be Exhibit 8.  Other contingent

8  and unliquidated claims of every nature, counterclaims of the

9  debtor, and rights to setoff, give estimated value of each.

10      Did you include in response to question 21 the

11  existence of a homestead refinancing agreement?

12      A.   Once second, Mr. Laun.  I'm sort of lost where

13  you're taking me.

14      Q.   Oh, I'm sorry.  Number 21 under Exhibit 8.

15      A.   Let me get back to Exhibit 8.  I was on Exhibit 21.

16      Q.   Oh, I'm sorry.

17      A.   I'm sorry, again, would you please repeat the

18  question?

19      Q.   With response -- your response to question number

20  21 on Exhibit 8, did you include the homestead refinancing

21  agreement on a claim that you had against Mrs. Riggert?

22      A.   No.

23      Q.   No.  Why didn't you?

24      A.   I'd look at that agreement between my spouse and

25  myself on an exempt asset.

1      Q.   Did you have the assistance of counsel when you

2  completed the schedules?

3      A.   Yes, sir.

4      Q.   And you took the advice of counsel in the

5  completion of the schedules?

6      A.   I'm not sure what you're asking me, Mr. Laun.

7      Q.   Well, let me ask you to turn to number 35 on

8  Exhibit 8.

9       Other personal property of any kind not already listed,

10 itemize.  And you put down, non-filing spouse's property

11 under sole management and control and separate property is

12 not listed.

13     A.   Okay.

14     Q.   Okay.  Do you  have a claim against your wife for

15 $65,000 under the homestead refinancing agreement?

16     A.   Mr. Laun, I think you're trying to focus on the

17 wrong issue on the home refinancing agreement.

18     Q.   Did you list anything about the debt your wife owed

19 you under the home refinancing agreement in response to

20 question 35 on Exhibit 8?

21     A.   I consider the home refinancing agreement to set

22 aside -- to set around what our agreement was on the proceeds

23 of the refinance.  That's her sole, separate property.

24     Q.   In your claim for reimbursement of the 65,000, is

25 that a claim that you own under the agreement?

1    A.   Mr. Laun, it says in the event.

2    Q.   So it's a contingent claim?

3    A.   I'm not sure I know what that means.

4    Q.   Okay.  Let me ask you to direct your attention to

5  Exhibit 9.

6         The fourth entry on Schedule F states, Cadle Company.

7         Could you read that to yourself?

8    A.   I'm sorry, do you want me to read it out loud?

9    Q.   No, just to yourself.  I just want you to get

10  familiar with it.

11    A.   Yes, sir.

12    Q.   Is Exhibit 9 true and correct?

13    A.   Yes.

14    Q.   Was it true and correct on the day you filed?

15    A.   Yes.

16    Q.   Is it true and correct today?

17    A.   Yes.

18    Q.   Would you make any changes to Exhibit 9?

19             MS. BARTHOLOW:  Your Honor, I'm going to

20  object to the extent that he's asking for a legal conclusion

21  as to the ownership by Cadle of a judgment.  That's a

22  different issue as to what his understanding of what Cadle

23  had.

24             THE COURT:  Response?

25             MR. LAUN:  Your Honor, I think the exhibit

1   speaks for itself.  When a debtor comes forward to seek

2   relief from the Bankruptcy Court, it's incumbent that they

3   truly list all of their assets and liabilities.

4            MS. BARTHOLOW:  Your Honor, in that case I

5   believe he's answered and the document speaks for itself.  It

6   says what it says.

7            THE COURT:  Sustained.

8       Q.   Did you -- do you dispute that you owe money to the

9   Cadle Company?

10      A.   I wish I would have a lot sooner.

11      Q.   I'm asking you today.

12      A.   That's why we're here, Mr. Laun.

13      Q.   On the day you filed, January 31 of '08, did you

14  dispute that you owed any money to the Cadle Company?

15      A.   It's listed on Schedule F --

16      Q.   As a creditor of your's?

17      A.   Holding unsecured, non-priority claims.

18      Q.   Did you check the box that it was disputed?

19      A.   No, sir.

20      Q.   Did you check that it was contingent?

21      A.   No, sir.

22      Q.   Did you check that it was unliquidated?

23      A.   No, sir.

24      Q.   Do you have any basis for not believing that you

25  owe the money to the Cadle Company specified in your sworn

1    Schedule B -- I'm sorry, Schedule F that's contained in

2    Plaintiff's Exhibit 9?

3        A.    Mr. Laun, I think we're going over this over and

4    over.  It's -- am I -- have I not answered your question

5    directly and properly?

6        Q.    No.

7        A.    I feel like you're harassing me a bit.

8             THE COURT:  Okay.  I'm going to instruct you

9    just to answer the question.  He asked you if you dispute the

10   claim to Cadle, essentially.

11            THE WITNESS:  No.

12       Q.    Okay.  Let me ask you to turn to Exhibit 10.

13        The third question on Exhibit 10 asked you to list all

14   payments to any creditors made within 90 days.

15       A.    Yes, sir.

16       Q.    Is the answer that you gave to question 3 on

17   Exhibit 10 true and correct?

18       A.    Yes, sir.

19       Q.    Of course, those payments were made in excess of 90

20   days, weren't they?

21       A.    I think the -- let's see, November 13th was within

22   90 days of the -- June 30th was beyond 90 days.

23       Q.    All right.  And you -- those payments were made on

24   a debt that you owed to the Cadle Company?

25       A.    The $5,000 was payment for a partial release for

1   the refinancing and the 8,762 was garnishment of my bank

2   account by the Cadle Company.

3       Q.   Let me ask you about that garnishment.

4       Didn't that garnishment occur in August of '07?

5       A.   Yes, sir.

6       Q.   And that's -- that was a garnishment of Merrill

7   Lynch, I believe?

8       A.   Yes, sir.

9       Q.   And that was done after the closing of the

10  refinance of your home that's described in Exhibit 1, isn't

11  it?

12      A.   Yes, sir.

13      Q.   All right.  And you went and signed this home

14  refinancing agreement on September the 4th?

15      A.   Yes, sir.

16      Q.   So it wasn't your motivation to have this home

17  financing agreement drawn up to try to exclude the $65,000

18  from the reach of the Cadle Company?

19      A.   No, sir.  The $65,000 was my wife's sole property

20  out of the refinance.

21      Q.   And you didn't fear that the Cadle Company might

22  discover it and garnish it?

23      A.   I think we disclosed it to you immediately.

24      Q.   When did you do that?

25      A.   I think after it was filed, we sent that to you.

1      Q.   Oh, you mean after the bankruptcy?

2      A.   Before.

3      Q.   Oh, after you filed the home refinancing agreement?

4      A.   Yes, sir.

5      Q.   Okay.  But I'm talking about your motivation for

6  filing, for signing a home refinancing agreement.

7       Didn't it have something to do with the garnishment

8  that took place in August of '07 by the Cadle Company?

9      A.   No, sir.

10     Q.   Didn't you have $65,000 after the closing on June

11  29th of '07?

12     A.   No, sir.

13     Q.   Where did it go?

14     A.   That's my wife's money.

15     Q.   Okay.  That's pursuant to the home refinancing

16  agreement?

17     A.   No.  That's pursuant to the facts.

18     Q.   Let me ask you to turn to Exhibit 10, question

19  number 3(c).

20      Did you list Mrs. Riggert in response to question 3(c)?

21     A.   No, sir.

22     Q.   Did she receive a transfer of $65,000 June 29th of

23  2007?

24     A.   This asks any payments that I made within one year

25  immediately preceding the commencement of the case.  I didn't

1  pay my wife $65,000, Mr. Laun.

2      Q.    There was a home refinancing agreement in which you

3  would have been able to get 65,000 out of it, right?

4      A.    I'm not sure I understand your question, Mr. Laun.

5      Q.    The $65,000 that your wife has promised in the home

6  refinancing agreement to pay you back, why does she owe that

7  to you?

8      A.    She does not owe me $65,000.  My -- my equity is

9  still in the home.  She refinance and got her equity out at

10 the time.

11     Q.    So this was a way of jockeying around the equity in

12 the home?

13     A.    Question 3(c)?  All debtors list all payments made

14 within one year immediately preceding the commencement of

15 this case for the benefit of creditors who are insiders.

16     My wife is not a debtor.

17     Q.    She's an insider, isn't she?

18     A.    I guess you're right.

19     Q.    Let me ask you to turn to the next page, item

20 number 10, other transfers.

21     Did you list any --

22     A.    I'm sorry, Mr. Laun, I'm not sure where I'm

23 supposed to be.

24     Q.    Exhibit 10 and it's question number 10.

25     A.    Okay.

1     Q.   Did you transfer any property within two years

2     prior to -- the two years prior to filing your bankruptcy?

3     A.   No, sir.

4     Q.   You didn't transfer your equity in the homestead to

5     your spouse in the amount of $65,000?

6     A.   No, sir.

7     Q.   She wound up with $65,000, didn't she, at closing,

8     and didn't she have a home refinancing agreement that set

9     that aside to her?

10     A.   She received $65,000 from the refinance.  But she

11     was the person -- the only person that took out the loan.

12     She's the only person that got the proceeds directly into her

13     account.

14     Q.   But that 65,000 is going to come back to you under

15     certain circumstances, whenever the house sold, right?

16     A.   No, sir.  My $65,000 is the first money out, not

17     her's.

18     Q.   Doesn't paragraph 4 of Exhibit 1 say that she is

19     going to pay you $65,000 if there's not sufficient money in

20     the sale of the house?   In fact, she's going to pay it at 6

21     percent interest in 120 equal monthly installments?

22     A.   Mr. Laun, there are several contingencies in the

23     home refinance agreement.

24     Q.   I was focused on paragraph 4.

25     A.   And in the event of.

1      Q.    Let me ask you to turn to the next page which is

2  paragraph 16, or question number 16 that's on Exhibit 10.

3      A.    Yes, sir.

4      Q.    You reside in the State of Texas?

5      A.    Yes.

6      Q.    You've resided in Texas at least for the eight

7  years preceding the commencement of this bankruptcy case?

8      A.    Yes, sir.

9      Q.    You checked none on that question 16.

10      You're not making a representation that you're not

11  married to Mrs. Riggert, are you?

12               MS. BARTHOLOW:  Excuse me, Mr. Laun, I'm lost.

13  Which document are you looking at now?

14               MR. LAUN:  Exhibit 10, and it's question 16.

15               MS. BARTHOLOW:  I apologize.

16      A.    Okay.  Please restate your question.

17      Q.    Is your answer to number 16 correct today?

18               THE WITNESS:  Molly, can you help me on that

19  one?

20               THE COURT:  What was your comment?

21               THE WITNESS:  I was just asking for Molly if

22  she could help me on that one.

23               THE COURT:  She can't.  You have to give your

24  answers.

25               THE WITNESS:  Okay.  Let me read the spouses

1    and former spouses.

2         I'm still married.

3         Q.   All right.  And you were married on the date that

4    you completed the schedules that would be -- or filed on

5    January 29th of '08?

6         A.   Yes, sir.

7         Q.   And so the answer to this question 16 must be an

8    error?

9         A.   Yes, sir.

10        Q.   Okay.  So you would change that to say that you do

11   have a spouse and her name is Lisa Riggert?

12        A.   Yes, I do have a spouse named Lisa Riggert.

13        Q.   All right.  Let me ask you to turn to Exhibit 19.

14        A.   Yes, sir.

15        Q.   Is that you identified on Exhibit 19 in an agreed

16   judgment?

17        A.   Yes, sir.

18        Q.   Do you recall authorizing your attorney, Nona

19   Thompson, to enter into an agreed judgment and have the Court

20   enter this judgment?

21        A.   I -- when was this in 1987, Mr. Laun?

22        Q.   I believe it was '88, February 12th of '88.

23        A.   No, sir, I do not recall that.

24        Q.   So you don't remember being sued by MBank, Lincoln

25   Center?

1    A.   Yes, sir, I do.

2    Q.   Oh, okay.  Was a judgment rendered against you?

3    A.   Yes, sir.

4    Q.   Do you have any reason to believe this isn't the

5  judgment that's Exhibit 19?

6    A.   I don't have any recollection, Mr. Laun.

7    Q.   All right.  Let me ask you to turn to Exhibit 20.

8     Have you ever seen this assignment of judgment?

9    A.   I can't assure you that I have from looking at it

10  now.

11    Q.   Do you have any reason to doubt the statements made

12  in this assignment are not true?

13           MS. BARTHOLOW:  Your Honor, there's no reason

14  for the question.  He said he's never seen it before.

15           THE COURT:  Sustained.

16    Q.   Let me ask you to look at Exhibit 21.

17     Have you ever seen this document before?

18    A.   I'm sorry, Mr. Laun, I thought I was on 21 the last

19  time.

20    Q.   21, you've never seen Exhibit 21?

21    A.   Again, I don't recall.

22    Q.   Okay.  Let me direct your attention to Exhibit 5.

23    A.   Yes, sir.

24    Q.   Do you recall a sheriff's deputy coming to visit

25  you on May 25th of 1998 with a writ of execution?

1      A.   Mr. Laun, I don't remember that, but I'm assuming

2  that it was -- that a constable or somebody served me.

3      Q.   All right.  Let me ask you to turn to Exhibit 6.

4       Do you recall on December 7th of '07 that a constable

5  appeared and sought to levy this writ of execution?

6      A.   Yes, sir.

7      Q.   You do recall that?  You do recall that?

8      A.   Yes, sir.  I thought I answered already, I'm sorry.

9      Q.   And did you have any property to give to the

10 constable?

11     A.   No, sir.

12     Q.   Okay.  Let me direct your attention to Exhibit 12.

13      Do you recognize Exhibit 12?

14     A.   Yes, sir.

15     Q.   And what is it?

16     A.   Personal financial statement.

17     Q.   And what was the purpose of you completing this

18 document?

19     A.   The Cadle Company asked me to.

20     Q.   All right.  Down there on -- under assets, cash on

21 hand, it's got $11,000.

22              THE COURT:  Just a minute.

23      Ms. Bartholow?

24              MS. BARTHOLOW:  Yes, Your Honor.  I'm going to

25 object as to relevance.  This is -- the cause of action

before us today is limited to was there a proper disclosure
of the agreement between the parties in the refinancing of
the home.  This financial statement with the Cadle Company
has nothing to do with the refinancing of the home.

THE COURT:  Your response to the relevance
objection?

MR. LAUN:  Your Honor, this testimony and this
exhibit is going to the concealment issue that this debtor on
the date that he provided this had already made the transfer
and failed to identify it in this financial statement.  That
is why it's part of the concealment of the asset.

THE COURT:  I overrule the objection.

You may proceed.

Q.   Did you -- on this -- was this financial statement
true and correct on the day that you signed it?

A.   In all material respects.

Q.   Well, what does that mean?  You handwrote that in,
didn't you?

A.   Yes, sir.

Q.   Was that to qualify the true and correct?

A.   No, sir.

Q.   Well, what did it mean?

A.   It's an unaudited financial statement.

Q.   Oh, that's what it meant.

Is that what you meant?

1     A.   To the best of my ability, yes.

2     Q.   Okay.  It means, to the best of my ability?

3     A.   Yes, sir.

4     Q.   Okay.  Did you reveal anywhere on this personal

5  financial statement provided in August of '07 of the $65,000

6  that your wife received in the refinancing?

7     A.   It's a personal financial statement, Mr. Laun.

8     Q.   Did you reveal anything about the transaction

9  concerning your homestead and the $65,000 that was taken out

10 of the homestead?

11    A.   It's my personal financial statement.  It's not my

12 wife's.

13    Q.   So you didn't reveal the existence of the agreement

14 that you were going to get that money back?

15    A.   Mr. Laun, that's -- I'm not sure -- my wife had

16 refinanced the house.  She got the money into her personal

17 account.  Wire transferred directly into her.  I never saw

18 the money.

19    Q.   But you did have plans to get it back?

20    A.   No, sir.

21    Q.   Well, what is Exhibit 1 for, then?

22    A.   To set out the equity in our house, my sole

23 separate property and her sole separate property.  And the

24 refinancing proceeds went to her.

25    Q.   And you would recover the $65,000 at some future

1   point?

2       A.   It's her $65,000, Mr. Laun, not mine.

3       Q.   Let me direct your attention to Exhibit 11.

4       A.   Yes, sir.

5       Q.   Line 105 of Exhibit 11, do you know who that payoff

6   went to, $5,000?

7       A.   That was a partial release payment to the Cadle

8   Company.

9       Q.   Okay.  So you owed some money to the Cadle Company

10  and you negotiated a partial release of lien?

11      A.   The Cadle Company would -- even though there was --

12  they're not allowed in the State of Texas, my understanding

13  is that they can't hold up a refinance.  But the title

14  company, they wouldn't give a partial release unless the

15  title company paid them $5,000 out of the refinancing.

16      Q.   Did you negotiate that yourself with the Cadle

17  Company?

18      A.   With the title company.

19      Q.   You didn't talk to Cadle about this?

20      A.   Yes, sir.

21      Q.   You did?

22      A.   I did.

23      Q.   And who did you talk to?

24      A.   Nate Smith.

25      Q.   And did you represent to him how much there was

1  going to be excess proceeds from the refinance?

2      A.   He had a copy of the closing statement, I think.

3      Q.   Prior to the closing?

4      A.   Oh, we've talked in generalities.

5      Q.   Did you send him a copy of the closing statement

6  prior to closing?

7      A.   I don't remember.

8      Q.   Did you tell him that you were receiving $65,000

9  out of the closing?

10     A.   No, sir.  I said that there would be $65,000 --

11 somewhere the amount of $60,000.

12     Q.   And you made that representation to him?

13     A.   I didn't rep and warrant anything, Mr. Laun.

14     Q.   Your deposition was taken on July 26th of '07.

15     A.   Yes, sir.

16     Q.   By the Cadle Company, and I took it.

17     A.   Yes, sir.

18     Q.   Did you reveal the existence of the home

19 refinancing agreement in that deposition?

20     A.   No, sir.

21     Q.   Why not?

22     A.   Didn't exist at the time.

23     Q.   When did you first start thinking about putting

24 together the home refinancing agreement?

25     A.   In June.

1      Q.   In June of '07 and --

2      A.   At the time of the refinance.

3      Q.   Okay.  Well, your deposition was taken July 26th of

4   '07.

5        Were you still thinking about it then?

6      A.   Yes, sir.

7      Q.   Okay.  But you hadn't consummated it or had it

8   written?

9      A.   No, sir.

10      Q.   Okay.  So you didn't turn it over to the Cadle

11   Company at the deposition on July 26th?

12      A.   No, sir.

13      Q.   You did turn over some other documents, didn't you?

14      A.   I'm sure I did.

15      Q.   When did you ultimately turn over a copy of the

16   home refinancing agreement to the Cadle Company?

17      A.   I'm not sure of the exact date.

18      Q.   Would that have been in November of 2007?

19      A.   Could have been.

20      Q.   I'm sorry -- 2007, yes.

21      A.   Could have been, Mr. Laun.

22      Q.   Well, was it -- did you have -- did you bring a

23   copy to the 341 Meeting?

24      A.   Which is that, Mr. Laun?

25      Q.   The Meeting of Creditors that you had in your

1    bankruptcy case.

2         A.   I can't remember.  I don't know if I did or not.

3    I know that it was discussed because you brought it up.

4                    MR. LAUN:  May I step back?

5                    THE COURT:  You may.

6                    MR. LAUN:  I have no more questions for this

7    witness, Your Honor.

8                    THE COURT:  All right.

9         Ms. Bartholow, your cross?

10                   THE WITNESS:  Molly, do you mind if I get a

11   drink of water?

12                   MS. BARTHOLOW:  Sure, go right ahead.

13                   THE WITNESS:  They told me it was fresh.  It

14   looks like there was a bug in it.

15                   THE COURT:  You thought there was a bug in it?

16                   THE WITNESS:  It looked -- the way the light

17   reflected.

18                   THE COURT:  She put fresh water in here this

19   morning before we started.

20                   THE WITNESS:  It's nice and cold.

21                   <u>CROSS-EXAMINATION</u>

22   BY MS. BARTHOLOW:

23        Q.   Okay.  Mr. Riggert, would you please turn to the

24   Government -- excuse me, not the government, Cadle Company's

25   Exhibit 7.

1      A.    Yes, ma'am.

2      Q.    And you'll see that that's your Schedule A of your

3  real property; is that correct?

4      A.    Yes, ma'am.

5      Q.    You stated that your homestead had a value of

6  $700,000?

7      A.    Yes, ma'am.

8      Q.    Is that correct under the column?

9       What is your opinion of the value of the house today?

10     A.    About the same.

11     Q.    Okay.  And what do you base that on?

12     A.    My recent D-CAT appraisal came in at $662,000, or

13  thereabouts.

14     Q.    Okay.  And you'll see that we've noted that the tax

15  appraisal was 434.

16      Do you see under --

17     A.    Yes, ma'am.

18     Q.    Okay.  Why is there such a spread between the tax

19  appraisal from I guess '07 was probably what you're looking

20  at and what we said the value was?

21     A.    Yes, ma'am.

22     Q.    Why is there a difference between what the tax

23  appraisal put on the value of the house and what you stated

24  the house value was?

25                    THE COURT:  Mr. Laun?

1           MR. LAUN:  Your Honor, the plaintiff objects

2    as to relevance.

3           THE COURT:  Relevance?

4           MS. BARTHOLOW:  Your Honor, I think what

5    they're trying to do is they're trying to say that there was

6    a receivable from Mrs. Riggert.  And what we're trying to say

7    is there was a division of equity.  And in order to have a

8    division of equity and to show that there was no intent to

9    hide anything from creditors, we need to establish there was

10   equity in the home.

11          THE COURT:  Overrule the objection.

12       You may answer.

13       A.   The recent appraisal has the land value of the

14   property at $600,000.  Home improvement value, $66,000.

15       Q.   Okay.  But I'm asking you about at the time you

16   filed your Schedule A here --

17       A.   Yes.

18       Q.   -- there was a tax appraisal value that we told the

19   Court about was 434?

20       A.   Yes, ma'am.

21       Q.   Why was it so low, if you know?

22       A.   That's just what the D-CAT had.

23       Q.   To your knowledge have they come out and

24   re-appraised?

25       A.   Yes.

NATIONAL COURT REPORTERS (214) 651-8393

1    Q.   Okay.  Now, when you valued the house at 700,000,

2  was that based on the refi that you had done in June?

3    A.   Yes.  That was based on the appraised value that

4  the appraisers put on the property when they appraised the

5  house.

6    Q.   For the refinancing?

7    A.   Yes.

8    Q.   Now, being in the real estate business, are you

9  aware of the general ratios that mortgage companies require

10  in order to make a home equity loan?

11    A.   They couldn't go beyond 80/20, 80 percent loan to

12  value.

13    Q.   Okay.  So --

14    A.   That's the maximum under the Texas law.

15    Q.   Okay.  All right.  Now, if you and Ms. Riggert were

16  to sell your home, do you have any other home to move to?

17    A.   No.

18    Q.   Have you ever considered selling your home?

19    A.   Yes.

20    Q.   Okay.  If you were to sell your home today, you

21  would get the first 65,000 in equity as your separate

22  property, correct?

23    A.   Yes.

24    Q.   Do you have any other money to buy a house with?

25    A.   Not at this time.

1      Q.    Okay.  So when you were making the agreement with
2  Mrs. Riggert, in your mind were you ever going to take the
3  equity out of the house to do anything but buy another house?
4      A.    No.
5      Q.    Okay.  So, again, just to be clear, the Exhibit
6  Number 1, which is the home refinancing agreement --
7      A.    Yes, ma'am.
8      Q.    In your mind was this nothing more than a
9  reallocating of equity in the home?
10     A.    Correct.
11     Q.    Okay.  Now, you do see that, as Mr. Laun has
12 pointed out, that there is a repayment section in there,
13 contingent, contingent on sales proceeds not being
14 sufficient?
15     A.    Right.
16     Q.    How long have you lived in your home?
17     A.    Since July of 1983.
18     Q.    Has there ever been a time where the home's value
19 has declined?
20     A.    No.
21     Q.    Did you, when you made this agreement, think that
22 the event of the value of the home being not enough to
23 generate the $65,000 in home equity back to you, did it ever
24 occur to you that there wouldn't be enough value in your home
25 to do that?

1      A.   No.  I always felt that the eventual sale of the

2 property, there would always be enough equity in the house

3 to -- that I was safe in preserving my portion of the equity

4 in the house.

5      Q.   How old a man are you?

6      A.   Way too old.

7      Q.   I understand.

8      A.   Born in 1954.

9      Q.   And that makes you?

10      A.   Well, let me take a look.

11       2009 minus 1954, I will be 55 on the 31st of May.

12      Q.   All right.  And what is the age of your wife?

13      A.   I'm never supposed to tell that.

14      Q.   Well, I understand, but you can today.

15      A.   She was born in 1957.

16      Q.   Okay.  So she's around 55 --

17      A.   You're 52, aren't you?

18      Q.   Okay.  52.

19      A.   I have her permission to say that she's 52.

20      Q.   Okay.  Now, I'm going to ask you to look at Exhibit

21 8 in front of you.

22      A.   Yes, ma'am.

23      Q.   And if you'll please flip the pages and tell me

24 when you've arrived at paragraph 12 of Exhibit B, about the

25 second page.

1    A.   Interest in IRA?

2    Q.   Right.  Right.

3    A.   Yes.

4    Q.   You're showing $400.  Is that all of the retirement

5    that you and your --

6              MR. LAUN:  Your Honor, we're going to object

7    as to relevance.

8              MS. BARTHOLOW:  Again, it goes to motivation

9    as to why are we doing this refinancing and what are we going

10   to do with the money if we sell it.

11             THE COURT:  Overrule the objection.

12        You can answer.

13   A.   Yes.  The IRA pension plan, my security benefit was

14   at the time about $400.

15   Q.   Has it changed substantially now?

16   A.   I haven't looked.  But I suppose it's not -- I

17   don't expect it to have gone up.

18   Q.   Due to market conditions or --

19   A.   Yes

20   Q.   Okay.  So you haven't made additional contributions

21   to the IRA?

22   A.   No.

23   Q.   Has Mrs. Riggert made any contributions?

24   A.   Not that I'm aware of.

25   Q.   All right.  So how are you going to be able to find

1    houses if you were to sell your home in the near future?

2        A.    I'm going to have to live in a smaller home.

3        Q.    Okay.  But how are you going to find a smaller

4    home?  What proceeds do you have, what money do you have?

5        A.    We'd have to sell the house and use the proceeds

6    from the sale of the house to move to a different house.

7        Q.    Okay.  Because there just aren't any other assets;

8    is that correct?

9        A.    That's correct.

10       Q.    All right.  Now, Mr. Riggert, when you executed

11   the schedules and on Exhibit 9 you listed Cadle Company --

12       A.    Yes, ma'am.

13       Q.    And you listed the judgment and the amount on the

14   judgment and that sort of thing.

15        Did you know whether the Cadle Company had properly

16   perfected an ownership interest in their judgment?

17       A.    No.

18       Q.    Then why did you list them there as a creditor?

19       A.    The constable had come to my house and produced a

20   document that said that there was a judgment owed.

21       Q.    Okay.  And I think you've already testified they

22   took your deposition saying that they owed the money; is that

23   correct?

24       A.    That's correct.

25       Q.    And they demanded money to release the lien when

1   you refinance; is that correct?

2       A.   That's correct.

3       Q.   And they also had garnished your account?

4       A.   Yes, ma'am.

5       Q.   So in your mind was there any reason to think that

6   they didn't own it?

7       A.   Well, they were certainly enforcing it.

8       Q.   Okay.  Did they ever show you any documentation to

9   prove that they own this judgment?

10      A.   No.

11      Q.   Now, the failure to list your wife on paragraph 16

12  of Exhibit 10, was that intentional or an oversight?

13      A.   Oversight.

14      Q.   Okay.  I'll point out that paragraph 3(c) that

15  Mr. Laun pointed out earlier lists your daughter, lists your

16  mother-in-law, mentions your wife's income and your wife's

17  car; is that correct?

18      A.   Would you point me to the correct --

19      Q.   Okay.  We're looking at Exhibit 10.

20      A.   Okay.

21      Q.   And then 3(c).

22      A.   Yes, I'm there now.

23      Q.   Okay.  It's clear you were indicating that you were

24  married and that you had a wife?

25      A.   Yes.

1    Q.   Okay.  Did you have any reason whatsoever to hide

2  the fact that you had a wife to the creditors?

3    A.   No.

4    Q.   Had you told Cadle Company previously that you had

5  a wife?

6    A.   Yes.

7    Q.   Was Cadle Company aware that your wife was getting

8  the loan when it got refinanced in June?

9    A.   Yes.

10    Q.   Did the Cadle Company also receive the closing

11  document?

12    A.   Yes, ma'am.

13    Q.   Okay.  How did they et that?

14    A.   They subpoenaed them, Countrywide and the title

15  company.

16    Q.   Okay.  Would you please --

17            MS. BARTHOLOW:  Pass the witness, Your Honor.

18            THE COURT:  All right.  Redirect?

19            MR. LAUN:  Just briefly, Your Honor.

20            REDIRECT EXAMINATION

21  BY MR. LAUN:

22    Q.   Let me ask you to look at Exhibit 1 again, please.

23    A.   Yes, sir.

24    Q.   Paragraph 5 contains a contingency under which your

25  spouse would owe you money.

1    A.    Yes, sir.

2    Q.    Paragraph 6, likewise, is a paragraph in which

3 there's a contingency that if it occurs your wife would owe

4 you money.

5    A.    Let me re-read that, Mr. Gate -- Laun, sorry.

6     I see that.

7    Q.    And you agree that there's a contingency that your

8 wife would owe you money if the contingency was met?

9    A.    Yes, sir.

10          MR. LAUN:  Okay.  I don't have any more

11 questions of this witness, Your Honor.

12          THE COURT:  All right.  Any recross?

13          MS. BARTHOLOW:  No, Your Honor.

14          THE COURT:  Thank you, Mr. Riggert.  You're

15 excused from the witness stand.

16     Let's take a five minute bathroom break and come back

17 for the next witness.

18               (Brief recess ensued.)

19          THE COURT:  We're going back on the record now

20 in Cadle Company v. Riggert.

21     Are you ready to call your next witness?

22          MR. LAUN:  The plaintiff has no more

23 witnesses, Your Honor.

24          THE COURT:  Okay.  The plaintiff rests?

25          MR. LAUN:  Yes.

1                THE COURT:  All right.  Ms. Bartholow, your

2     defense.

3                MS. BARTHOLOW:  Your Honor, at this point we

4     would ask for judgment.  I don't believe that they have

5     properly proved that they do have the ownership of the

6     judgment that they have marked as Exhibit 2.  I would point

7     to their Exhibit 3.  This is the assignment from MBNA to Bank

8     One.  There's the FDIC as receiver of MBank.  It's assigning

9     to Bank One.  And I'll point out that the first paragraph

10    refers to an Exhibit A.  But there is no Exhibit A attached

11    to this document.  So the Court doesn't know what was

12    transferred pursuant to this assignment.

13        Now, I would ask the Court to flip over to Exhibit 20.

14                THE COURT:  Okay.

15                MS. BARTHOLOW:  On Exhibit 20 we have

16    something that has stamped across it, Unofficial document.

17    And it has an Exhibit A attached to it.  Now, if this is

18    unofficial --

19                MR. LAUN:  Your Honor, this appears to be an

20    objection to an exhibit being made.  The exhibits have been

21    admitted.  And the only objection could be relevancy.

22        Is that the nature of the objection being made?

23                THE COURT:  Well, Ms. Bartholow, respond, what

24    I thought you were doing was asking for judgment.  And I

25    think you're making the argument that Cadle has not

1  established through its evidence that it is even a holder of

2  a claim against the debtor.

3          MS. BARTHOLOW:  Correct, Your Honor.

4          THE COURT:  So is the motion for judgment

5  because of lack of standing?

6          MS. BARTHOLOW:  Correct, Your Honor.

7          THE COURT:  So you're just walking me through

8  these exhibit, not per say as an objection --

9          MS. BARTHOLOW:  And in fairness to Mr. Laun,

10  I'm trying to point out that there was another document that

11  appears to be a copy of Exhibit 2, although it has unofficial

12  across it.  And it does appear to have an attachment to it,

13  an Exhibit A.  And Mr. Riggert's name appears on there.  But

14  it references volume 88251 and page 0575.  And it is that

15  document that identifies what was transferred.  So we should

16  have that document in the packet.  And I don't see it

17  anywhere.

18      We know it's not Exhibit 19, because the pages at the

19  top are not the same.  They're 000573 and there's no

20  indication that it's a book.  So the judgment that is

21  identified on Exhibit A isn't here.  And that's part of my

22  argument.

23      But assuming I fail on that for whatever reason, then

24  you turn to assignment of judgments.  And I'm just going to

25  go to Exhibit 21.  There is a copy, Exhibit 4, regarding -- I

1  think these are an identical set.

2      Okay.  But looking at this Exhibit 4, there's

3  referenced in there other documents that we don't have that

4  condition the assignment.  The last paragraph is in all caps

5  and it says, The assignment contemplated hereby is without

6  recourse, representation, or warranty, except to the extent

7  restricted, only to the extent set forth in that certain

8  agreement for sale and purchase of notes and judgment, the

9  agreement dated May 28th, 1992 by and between assignor and

10 assignee, which agreement is incorporated herein by reference

11 for all purposes including specifically but not by way of

12 limitation paragraphs 26, 27, 29, and 30.

13     Well, you know, Your Honor, we don't know what those

14 restrictions are.  We don't know whether they only got

15 assigned a certain portion of the agreement or what those

16 restrictions are.  So, again, we don't have proof of an

17 unfettered assignment from someone starting with MBank, or

18 Mercantile Bank, all the way through to Cadle Company.  We've

19 got kind of a snuff at it, but we don't get there.  And

20 Exhibit A, again, the same Exhibit A that was on the prior

21 assignment document refers, again, to the judgment on

22 882510575.  And we don't have that document.

23     Interestingly, when you look at the next exhibit, which

24 is Exhibit 5, they don't refer to the Exhibit A referenced.

25 They refer to something else.  They're saying, Manifest and

1  book -- I'm sorry, I'm reading in the middle of the page

2  right under where James Riggert is in all caps.  It says for

3  the sum of $40 thousand plus dollars besides costs as of

4  record is manifest in book 1268573 of the records of said

5  court.

6       Well, okay.  That seems to relate to Exhibit 2.  But

7  Sheriff can't go out and execute on Exhibit 2 until there's

8  proof that Exhibit 2 got to Cadle.  I understand that's what

9  Cadle thought they were executing on.  But this -- my

10  understanding of what Texas law is, is that you have to have

11  an abstract of judgment in order to preserve the judgment

12  that, yes, you can execute on the judgment, but we don't have

13  something that assigns anything but what's on Exhibit A,

14  which is volume 88251 and page 0575.  And we don't have that

15  document here.  We don't have proof of what it is.  We've got

16  an inkling of what it might be, but it's not here before us

17  today.

18       So first I'm asking for judgment on the fact that I

19  don't think that they have standing to bring this action.

20  Second, I don't believe that they've proven any intent or

21  materiality.  The issue here is we've got an agreement

22  between spouses that's designed in their minds to deal with

23  the division of equity.  And the division of equity is not

24  going to be available for creditors.

25       Now, there's a contingency even under the Texas law.

If they sell their home and don't reinvest the proceeds in
six months, then there's a contingency that the equity in the
home would be available to creditors at that time.  But I'm
not aware of Courts that view that contingency as enough to
strip one party or the other from their interest in the home,
when the home is homestead.  No objection to homestead has
been raised.  And so what that would mean is every single
debtor who is married and the spouse doesn't file would have
to list as a contingency that perhaps there would be a sale,
there wouldn't be -- that was it.  And the equity wouldn't be
reinvested in six months.  And I don't think that was
realistic.  I think that is exactly the context the parties
were thinking of here.  They had just gotten their refinance
where the Bank had valued it for 700,000.  They never thought
that the contingencies could ever happen.

        We all know now that market values go up.  They go down
on houses.  But this house's value hasn't gone down.  So the
contingency is still not realistic.  And I -- I don't see
that it's a material issue under the definition of Pratt and
this Court's review in the Hughes case.  I don't see that
they've shown any intent to defraud.  What they've shown is
that Mr. Riggert communicated with Cadle.  That Cadle knew
about the transaction, knew the money went right from the
title company into Mrs. Riggert's account.  And to show you
that they knew that, they have provided Exhibit 16, which is

1   a domestic outgoing wire transfer request.  And the

2   originator is Hextor Fair Title Company.  And they list the

3   originator's address and all of that.

4              THE COURT:  Ms. Bartholow, I'm going to go

5   ahead and end this and make a ruling on the motion for

6   judgment.

7        I'm going to deny the motion.  And I do want to hear

8   your defensive evidence.  But first let me address the

9   standing argument which you made, the alleged lack of

10  standing of Cadle.  The evidence in your view not

11  establishing a clear chain that they are a creditor of

12  Mr. Riggert.

13       I have wrestled with this type of issue before where we

14  had a 727 trial and then argument is made that the creditor

15  doesn't have standing.  And I have written an opinion, I

16  don't think it's a published opinion, but it would be on the

17  web site, 8400 Northwest v. Morgan, where I've addressed this

18  issue.

19       The Court interprets the law out there to be as

20  follows.  Even if a creditor is a disputed creditor, for

21  example, even if there was a claim objection that had already

22  been filed in this case by you or the Trustee, even if the

23  Court had tried to conclusion and disallowed Cadle's claim

24  and that was let's say on appeal at the District Court by

25  Cadle, I interpret the 5th Circuit law to be that they still

1   have standing to go forward with the 727 action.

2        In the 8400 Northwest v. Morgan case I cited a 5th

3   Circuit case or opinion entitled Stanley v. Vahlsing,

4   V-a-h-l-s-i-n-g, 829 F.2d 565, 5th Circuit 1987.  It's not

5   precisely on point to your situation here, but I think it

6   does stand for the proposition that unless a creditor's claim

7   has been finally disallowed through every level of

8   adjudication, they still have standing to go forward on a 727

9   action.  And I know that's an awkward chicken/egg situation

10  for debtors in this situation, but that is how I interpret

11  the 5th Circuit law which I'm bound by.

12       So, again, even though I see that there is a dispute,

13  of course, Mr. Laun disagrees because of the schedules that

14  have been admitted into evidence, I don't think those are an

15  admission or binding on you.  The fact that there's a dispute

16  here under Vahlsing I think does not matter as long as they

17  still have a chance at the end of the day of having an

18  allowed claim, they get to go forward.

19       Now, with regard to the other argument.  You know,

20  you're seeking my judgment that they have not established

21  intent as a matter of law.  I'm still pondering that,

22  Ms. Bartholow, and I'm not in a position right now to make

23  the conclusion you want me to make.  So I am going to deny

24  the motion and I want to hear your defensive evidence.

25            MS. BARTHOLOW:  Thank you.

1          THE COURT:  All right.  So with that, I ask

2    you to call your first witness.

3          MS. BARTHOLOW:  I'll call Mr. Riggert.

4          THE COURT:  Mr. Riggert, you can take your

5    seat on the stand again.  And I'll remind you you're still

6    under oath from the last swearing in.

7                    JAMES RIGGERT

8    The witness, having been previously sworn to tell the truth,

9    testified on his oath as follows:

10                  DIRECT EXAMINATION

11   BY MS.BARTHOLOW:

12       Q.   Okay.  Mr. Riggert, would you explain to the Court

13   the circumstances that drew you and Mrs. Riggert to consider

14   putting a new loan on your home?  Why was that necessary?

15       A.   To pay Trinity University where my daughter goes

16   was asking for their tuition, so we needed to seek a home

17   equity loan to pay for the $17,000.

18       Q.   Okay.  Was that the only source of funds you had?

19       A.   Yes.

20       Q.   Now, why was Mrs. Riggert the one to seek the loan?

21       A.   My credit isn't -- my credit score did not allow me

22   to get approval.

23       Q.   Did the Cadle Company show up on your credit score?

24       A.   On my credit report, yes.

25       Q.   Okay.  Now, was it your understanding that the

1  money that was going to come out of any refinancing would go

2  to your wife directly and not to you?

3      A.   That was always the case.  It would always go to

4  Lisa.

5      Q.   Okay.  And why was that?

6      A.   We've operated a long time with her separate

7  property and my separate property.  And it was her loan and

8  she was getting the proceeds.

9      Q.   Okay.  Now when you executed Exhibit 1, which is

10  the home refinancing agreement, did you go to the attorney to

11  draw something up?

12      A.   We asked the attorney to draw something up.

13      Q.   Okay.  Let's name the attorney.

14      A.   John Justima.

15      Q.   Okay.  And is he someone who has done work for you

16  before?

17      A.   Yes.

18      Q.   Okay.  What was the purpose of the homestead

19  refinancing agreement?

20      A.   To just make it clear that the money that was

21  Lisa's equity and my equity stayed in the house.

22      Q.   Okay.

23      A.   That's it.  It was her sole property.

24      Q.   Now, you've heard Mr. Laun focus on different

25  paragraphs about the repayment of the equity portion.

1      You must say yes or no.

2      A.    Yes.

3      Q.    Because they can't pick it up.

4      Okay.  When you went to the attorney and asked for this

5   to be drafted, was that something that you told the attorney

6   to include?

7      A.    No.

8      Q.    What directions did you give the attorney?

9      A.    We'd like a home refinancing exhibit that clearly

10   identifies that the proceeds from the refinance were Lisa's

11   sole separate property and that my equity stayed in the

12   house.

13      Q.    Okay.  Did he call you back in and go over every

14   paragraph when you signed this?

15      A.    We assumed that it was -- you know, we sat down, we

16   looked through it, we signed it.  We didn't go through

17   everything left and right and we just assumed that this is an

18   agrement between Lisa and I that the proceeds were her sole

19   separate property and my equity was still in the house.  And

20   that when the house ever gets sold, the equity that -- the

21   first part of the equity that comes out is mine.

22      Q.    Okay.  Did you ever consider that any of these

23   contingency events, like the sales price wouldn't be enough

24   to generate enough to pay you back?

25      A.    No.

1     Q.   Or to pay you $65,000?

2     A.   We never considered any of those contingencies

3  ever.  We just focused on the first part.  The net

4  refinancing proceeds are intended to be and shall constitute

5  the sole separate property of wife.  Husband hereby disclaims

6  and renounces any community property or other interest in the

7  net refinancing proceeds.

8     Q.   Okay.  But now it's time to consider, because the

9  Court needs to understand, do you view these contingencies as

10  real or imminent today?

11     A.   No.  No.

12     Q.   Why not?

13     A.   The house value is above the note value.  I mean,

14  the house value is for somewhere around 650, $700,000.  And

15  the debt is about 491,000.

16     Q.   Okay.  When you were doing your schedules, were you

17  thinking that there might be a shortfall in the equity so

18  that your wife would end up owing you money?

19     A.   No, never.

20     Q.  Was that something that -- never mind.  Withdraw the

21  question.

22               MS. BARTHOLOW:  No further questions.

23               THE COURT:  All right.  Cross, Mr. Laun?

24

25               (no omission)

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. LAUN:

3        Q.    Did I understand you, Mr. Riggert, that the

4    agreement that's Exhibit 1 contains some provisions that you

5    do not approve of, or you did not approve of, or you now

6    don't approve it?

7        A.    Never expected to have happen.

8        Q.    Okay.  But you approved the entire agreement?

9        A.    We signed the entire agreement.

10       Q.    And you understood it had some contingencies at the

11   time you signed it?

12       A.    Yes, sir.

13       Q.    Okay.  But you just didn't think that that would

14   occur in the future?

15       A.    We didn't understand it really, Mr. Laun.  And we'd

16   never expected them to occur.

17       Q.    Okay.  So you didn't understand the contingencies

18   in the agreement?

19       A.    No.  We understood them, but never -- thought

20   they'd never occur.  They seemed like --

21       Q.    Well, let me as you this.

22       A.    Yes, sir.

23       Q.    Do you keep any -- you know, since the purpose of

24   the agreement was to keep your separate estates with regard

25   to your home, you must have some records of that.

1       A.    I'm not sure I understand.

2       Q.    Well, do you keep any records with regard to how

3   much you've contributed to the payment of Mrs. Riggert's loan

4   on the house and the amounts that she's paid on it?

5       A.    We're pretty bad record keepers, so the answer is

6   we'd have to go back and reconstruct them.

7       Q.    You don't keep any specific records about who pays

8   what?

9       A.    Yes, we do.  I mean, I don't have a ledger.

10      Q.    Okay.  You don't keep a ledger or anything because

11  the agreement requires you to kind of keep track of that,

12  doesn't it, in paragraph 2?

13      A.    Yes.

14      Q.    Okay.  So in order for the equities to be balanced,

15  there's got to be some record keeping  about who pays what on

16  the mortgage?

17      A.    I guess you could read it that way.  I don't really

18  read it that way.

19      Q.    How do you read it?

20      A.    Interest on the $123,000 difference between the

21  original loan and the new along paid by the wife.  So we make

22  payment on the house and part of the payments are made from

23  the -- the first balance.

24      Q.    Are you keeping track on the interest accruing on

25  the $123,250?

1      A.    Not on a regular basis.

2      Q.    Have you done it ever?

3      A.    Not yet.

4      Q.    Have you calculated how much you've contributed to

5    the payments made to Countrywide?

6      A.    Not yet.

7      Q.    When you say "not yet", because you don't care to

8    keep track of that?

9      A.    We're pretty bad record keepers.

10     Q.    Okay.  The -- let me ask you to turn to 16, please.

11        This account that's identified here on Exhibit 16, is

12   that an account controlled solely by Mrs. Riggert?

13     A.    I don't know.

14             MS. BARTHOLOW:  Your Honor, there are two

15   accounts referenced here, the outgoing and the incoming.

16             THE COURT:  Okay.  Let's be more specific,

17   Mr. Laun.

18             MR. LAUN:  All right.  I apologize, Your

19   Honor.

20     Q.    Mrs. Riggert doesn't work for Hextor Fair, does

21   she?

22     A.    No, sir.

23     Q.    Okay.  She doesn't have an account with them?

24     A.    No, sir.

25     q.    Okay.  Let me ask you then, the account that's

1  identified as beneficiaries account number, and beneficiary

2  is Lisa B. Riggert, is that a bank account that belongs to

3  Mrs. Riggert?

4      A.  I don't know which account that is, Mr. Laun.

5      Q.  Were you a signer on any of Mrs. Riggert's bank

6  accounts?

7      A.  No.

8      Q.  So it's fair to say that you're not a signer on

9  this Chase bank account?

10     A.  Correct.

11          MR. LAUN:  We don't have any more questions,

12  Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MS. BARTHOLOW:  Yes.

15      May I approach the witness?

16          THE COURT:  You may.

17              REDIRECT EXAMINATION

18  BY MS. BARTHOLOW:

19     Q.  Mr. Riggert, would you please turn to Exhibit D-D?

20     A.  Yes, ma'am.

21     Q.  And what is the name on that account?

22     A.  Lisa B. Riggert.

23     Q.  And is it with Chase Bank?

24     A.  Yes.

25     Q.  And do you see right underneath the top left-hand

1    corner it says, Chase, and then it says JP Morgan Chase Bank;

2    do you see that?

3        A.    Yes.

4        Q.    Okay.  And somewhere it has an account number.

5    Okay.  In the upper right-hand corner it has an account

6    number; do you see that?

7        A.    Yes.

8        Q.    The last four digits are 6716; do you see that?

9        A.    My copy reads 5716.

10       Q.    Okay.  And now I'll ask you to look at Plaintiff's

11   Exhibit 27.

12                   MR. LAUN:  I think you mean 16.

13                   MS. BARTHOLOW:  I'm sorry, I do.  Thank you.

14                   THE COURT:  Okay.

15                   MS. BARTHOLOW:  I apologize.

16       Q.    And again looking at the beneficiary information

17   where you see that the person receiving the wire is named as

18   Lisa Riggert and it's at a JP Morgan Chase account and the

19   last four digits are 5716.

20       A.    5716.

21       Q.    Okay.  All right.  So it appears to be the same as

22   Exhibit D-D;  is that correct?

23       A.    Yes.

24       Q.    All right.  To your knowledge, did your wife

25   receive a wire from the title company?

1      A.   Yes.

2      Q.   Okay.  You'll see on D-D it says right under

3  checking summary, deposits and additions, 67,540.44; do you

4  see that?

5      A.   Yes, I do.

6      Q.   Okay.  And right below captioned in a box deposits

7  additions; do you see that?

8      A.   Yes.

9      Q.   All right.  There's a date, 07/09; do you see that?

10     A.   Yes.

11     Q.   Okay.  And then moving across the page to the right

12  it says, FID wire credit and it mentions Hextor Fair,

13  correct?

14     A.   Yes.

15     Q.   And the amount is 65,864.49?

16     A.   Yes.

17     Q.   Do you see that?

18     A.   I do.

19     Q.   All right.  Let's go back to 16.  And flip to the

20  second page.  And toward the middle of the page toward at the

21  bottom it says, amount of transfer:?

22     A.   Yes.

23     Q.   65,864.49?

24     A.   Yes, ma'am.

25     Q.   Okay.  So this appears -- this Exhibit 16 appears

 1  to have been received at the Chase Bank in the name of Lisa

 2  Riggert on 7 -- July 9th?

 3      A.   Yes.

 4           MS. BARTHOLOW:  No further questions.

 5           THE COURT:  All right.  Any recross?

 6           MR. LAUN:  Just one question.

 7                 RECROSS-EXAMINATION

 8  BY MR. LAUN:

 9      Q.   The account that's identified in Exhibit D, that

10  Lisa Riggert account, you're not a signer on that account,

11  are you?

12      A.   No.

13      Q.   Okay.  And you -- you were interested in not having

14  any large sums of money in your bank account because of the

15  possibility of it being garnished by Cadle?

16      A.   I have money in my bank account, Mr. Laun.  This is

17  my wife's sole separate property.

18      Q.   Okay.  But that was one of the reasons why you put

19  the money with your spouse, right?

20      A.   I didn't put the money with my spouse, Mr. Laun.

21      Q.   It was your money, wasn't it?

22      A.   No.

23      Q.   Oh, it was her money?

24      A.   It was her money.

25      Q.   But you were going to -- you were supposed to get

1   it back, though, under the home refinancing agreement, you

2   understand that?

3       A.   I see your point you're making.  But, no, that

4   money was my wife's money, never my money.

5       Q.   So what's the purpose of the home refinancing

6   agreement where you get the $65,000 paid back to you on the

7   sale of the house?

8       A.   No, no.  My portion of the equity is still in the

9   house.   That's her portion of the equity that was taken out

10  of the house.

11      Q.   Okay.  So you don't -- but you do get the first

12  $65,000 of the net proceeds?

13      A.   The first 65,000, yes.

14      Q.   Okay.

15              MR. LAUN:  No more questions, Your Honor.

16              THE COURT:  All right.  Thank you,

17  Mr. Riggert.  Once again you're excused from the stand.

18       Ms. Bartholow, any other evidence?

19              MS. BARTHOLOW:  Yes, thank you, Your Honor.  I

20  call Mrs. Riggert.

21              THE COURT:  All right.  Mrs. Riggert, if you

22  could approach our court reporter and raise your right hand.

23  She'll swear you in before you take the witness stand.

24                      (The witness was sworn by the Court.)

25                      (no omission)

1                    LISA RIGGERT

2  The witness, having been duly sworn to tell the truth,

3  testified on her oath as follows:

4                  DIRECT EXAMINATION

5  BY MS. BARTHOLOW:

6       Q.   Would you please state your name.

7       A.   Lisa Baber Riggert.

8       Q.   Thank you.  Ms. Riggert, you've heard the

9  discussion today.

10        Are you the wife of the debtor?

11       A.   I am.

12       Q.   And how long have you been married?

13       A.   Since 1981.

14       Q.   Okay.  So were you married at the time that MBank,

15  Mercantile Bank got the judgment against your husband?

16       A.   Yes.

17       Q.   Okay.  And you're aware of who the Cadle Company

18  is; are you not?

19       A.   Yes, I am.

20       Q.   Would it be fair to say that they have attempted

21  collections for many years?

22       A.   Yes.

23       Q.   Are you employed?

24       A.   I am.

25       Q.   How are you employed?

1    A.   I'm self-employed as an interior designer with LBR

2  Designs, LLC.  And I currently have a part-time job as

3  assistant manager at the St. Michael's Women's Exchange.

4    Q.   Okay.  Is that a paid job?

5    A.   Yes.  Hourly.

6    Q.   Has it been important during your marriage that you

7  also have an income?

8    A.   Yes.

9    Q.   Okay.  Would it be fair to say that your income is

10  uneven in the type of work you do?

11    A.   Very much so.

12    Q.   And would that also be true for your husband?

13    A.   Yes.

14    Q.   Have you maintained accounts in your sole name

15  throughout your marriage?

16    A.   Yes.

17    Q.   Okay.  Let me ask you to turn to Exhibit D-E.

18       Do you recognize the account that's shown there?

19    A.   Yes, I do.

20    Q.   Is that your account?

21    A.   Yes, it is.

22    Q.   And you've heard me go through with Mr. Riggert the

23  July 9th wire transfer of $65,864.49?

24    A.   Yes.

25    Q.   You see that on the statement there?

1        A.    I do, yes.

2        Q.    Okay.  And do you know that to be a wire of the

3   home proceeds?

4        A.    I do.

5        Q.    Okay.  Now, why did you seek the refinancing of

6   your house?

7        A.    Well, we had several outstanding bills, one of

8   which was Trinity University.  If we would not have

9   refinanced our home, if I would not have refinanced the home,

10  then Emily would not have been allowed to go back to Trinity

11  University in the fall because of lack of payment for her

12  tuition.  In addition, we had living expenses that we needed

13  money to live off of.

14       Q.    Okay.  And neither you nor Mr. Riggert had the

15  funds available?

16       A.    Had no funds available.

17       Q.    Okay.  What made you decide to do the home

18  financing all on your own?

19       A.    Because my credit would allow it.  It was the only

20  way we could do it.  The only way I could do it would be to

21  refinance it.  And Emily was in need of having her tuition

22  paid and I was happy to do it.

23       Q.    Okay.  When you sought refinancing, did the Bank do

24  a re-appraisal of your home?

25       A.    Yes.

1    Q.   What did they appraise it for, what amount?

2    A.   I believe it was $700,000.

3    Q.   Okay.  And was that important to the amount of the

4    loan that you could get?

5    A.   Absolutely.

6    Q.   Okay.  Did you take the maximum that the mortgage

7    company would allow you take?

8    A.   No, we didn't.  There was still money that we could

9    have taken out.  And I don't remember the exact figure, but

10   it could have been as much as 50,000 more that we could have

11   taken out.

12   Q.   So the equity at the time you made the agreement

13   with your husband to split the proceeds --

14   A.   Uh-huh.

15   Q.   I'm not saying that correctly.  You took your

16   equity out --

17   A.   Correct.

18   Q.   -- in the refinancing.  At the time you did that,

19   there was substantial equity in the home?

20   A.   Absolutely.

21   Q.   Were you aware that the Exhibit 1 home refinancing

22   agreement had a requirement for you to repay your spouse in

23   the event that the home's value would not be enough to repay

24   him fully for --

25   A.   No.  I wasn't aware of that contingency.  It was my

 1    understanding that agreement laid out my equity in the home,

 2    Jim's equity in the home.  And that was my understanding.

 3        Q.   Okay.  At the time you signed the home refinancing

 4    agreement, was there any contemplation of selling the home?

 5        A.   No.  No.  That was really done just to make sure

 6    that things were fair in our business dealings.  We hadn't

 7    been as good at record keeping.  We thought it was a good

 8    idea to get something structured so that in the event of the

 9    death of one of us, or the sale of the house, that it could

10    all be done above board.

11        Q.   Okay.

12        A.   But never -- it's a stable relationship.  We never

13    had any sort of indication that we were going to sell, that

14    we were going to have any reason to use that.

15        Q.   And you understood that the home refinancing equity

16    agreement would be filed of record in the deed records?

17        A.   Oh, yeah.

18        Q.   And to your knowledge, was it filed?

19        A.   I'm assuming it was, yes.

20        Q.   Okay.  So this was intended to put the world on

21    notice --

22        A.   Right.  Right.

23        Q.   -- that you and your husband had this agreement?

24        A.   Correct.

25        Q.   Okay.  Now, you understand that the Cadle Company

1    is trying to say that you and Mr. Riggert secreted this

2    agreement from the public?

3         A.  I understand that.  That's not the case.

4                   MR. LAUN:  Your Honor, object to that

5    characterization.  We've never said that the public wasn't

6    notified by the deed records.

7                   THE COURT:  Sustained.

8         Q.  To your knowledge was a copy of this home

9    refinancing -- homestead refinancing agreement provided to

10   the Cadle Company?

11        A.  Yes.

12        Q.  Was a copy delivered directly to Mr. Laun?

13        A.  Yes.

14        Q.  And why did you decide to give a copy of the

15   homestead refinancing agreement to Mr. Laun?

16        A.  Full disclosure.

17        Q.  Okay.  Are there any of the home refinancing

18   proceeds remaining in your account?

19        A.  None.

20        Q.  Okay.  Let me direct you to Debtor's Exhibit D-E.

21        A.  Okay.

22        Q.  And do you see that's an account at Merrill Lynch?

23        A.  Uh-huh.

24        Q.  And it's in your name; is that correct?

25        A.  That's correct.

1    Q.   And it says, separate property?

2    A.   Yes.

3    Q.   Okay.  Now, let me ask you to flip about three

4 pages and you'll see an asterisk on the page.

5         MS. BARTHOLOW:  Your Honor, I will testify

6 that is my asterisk.  It wasn't in the original.

7    Q.   It's designed to help you see something called

8 funds received, $30,000.

9    A.   Uh-huh.

10    Q.   Okay.  What are those funds?

11    A.   Those were funds that were from my refinance that I

12 took out of the Chase account and put into my Merrill Lynch

13 account.

14    Q.   Okay.

15    A.   After I had paid the Trinity University bill.

16    Q.   Okay.  And then those funds rolled over to D-F, the

17 remainder of those funds; is that correct?

18    A.   That's correct.

19    Q.   Would you look at D-F?

20    A.   Yes, I see it.

21    Q.   Okay.  And you'll see again on the second page an

22 asterisk showing electronic transfer of 28,583.18.

23    A.   I see that.

24    Q.   Okay.  And is that your recollection?

25    A.   Yes, it is.

1     Q.   That account is also styled, Lisa Baber Riggert,

2  separate property; is that correct?

3     A.   It is.

4     Q.   And that's another Merrill Lynch account that you

5  have?

6     A.   Correct.

7     Q.   Okay.  At any time did you put any money from

8  Mr. Riggert in any of the accounts shown on D-D, D-E, or D-F?

9     A.   No.

10     Q.   Okay.  And generally looking through here, do you

11  recall how the funds that went into these accounts, how they

12  were spent?

13     A.   Yes.  They were spent on insurance, Hartford

14  Insurance.  They were spent on Hannah's tuition at Bishop

15  Lynch.  And they were spent on living expenses.

16     Q.   And I believe you said also the Trinity --

17     A.   And Trinity, correct.

18     Q.   Now, both of your daughters have learning

19  challenges; is that correct?

20     A.   That's correct.

21     Q.   Okay.  And that's why they're -- they have been in

22  special schools?

23     A.   This is correct.  It's been by the recommendation

24  of various psychologists and psychiatrists that they be in

25  small private institutions where they can get remediation for

1  their learning differences.

2      Q.    Okay.  Are you aware of the value of the house

3  today?

4      A.    Yes.

5      Q.    And what would you say the value of the house is,

6  meaning your home?

7      A.    The tax -- the tax valuation came in around

8  662,000.  There's a house down the street that's of

9  comparable size that is on the market now for 739,000.  We've

10  had discussions with various builders and a neighbor who is

11  actually interested in purchasing the property.  At and

12  around those values.

13      Q.    Okay.  In your opinion is there sufficient equity

14  to repay your husband?

15      A.    Absolutely.

16      Q.    Okay.  If you were to sell the house now, what

17  would you do with the proceeds?

18      A.    We'd have to buy another house.  We have no other

19  funds with which to buy a house.

20      Q.    Thank you.

21          MS. BARTHOLOW:  No further questions.

22          THE COURT:  All right.  Cross-examination?

23          CROSS-EXAMINATION

24  BY MR. LAUN:

25      Q.    The Chase account that's identified as Defendant's

```
 1   D and F, those are accounts solely controlled by you?

 2        A.   Correct.

 3        Q.   And Mr. Riggert is not a signer on those?

 4        A.   Mr. Riggert is not a signer on those.

 5        Q.   Has he ever been a signer on your bank account?

 6        A.   Never.

 7        Q.   Okay.  Was the -- was the money deposited after the

 8   closing that occurred, the wire transfer, Plaintiff's Exhibit

 9   16 of the 65,000, was that put into your bank account because

10   of -- you didn't owe Cadle any money?

11        A.   It was put into my bank account because it was my

12   money.

13        Q.   Okay.  And are you keeping any records of the

14   interest accruing on the 123,250?

15        A.   I am not.

16        Q.   Okay.  Do you keep any records on how much money

17   Mr. Riggert contributes to the house payment as opposed to

18   your --

19        A.   We have record of it, yes.

20        Q.   But you don't keep a ledger or anything like that?

21        A.   I don't keep a written ledger, no.

22        Q.   When you say a record, you just mean cancelled

23   checks?

24        A.   Yes.  And a filing system.

25        Q.   Okay.  You don't know today how much he's paid
```

1  towards the mortgage on the house?

2      A.   I don't.

3      Q.   Okay.  And towards that $123,000.

4      A.   I don't.

5      Q.   When you testified earlier under examination by

6  Ms. Bartholow you suggested that the home financing

7  agreement, refinancing agreement, Exhibit 1, that you weren't

8  aware of the contingencies or Mr. Riggert --

9      A.   Correct.  Correct.

10     Q.   But you -- so does it not express the agreement

11 between you and Mr. Riggert?

12     A.   It expresses the agreement that I signed.  I will

13 have to say that I focused on the very front of that

14 agreement, which was that my equity was my equity and Jim's

15 equity was his.  And, frankly, I didn't read the fine print.

16 I did not review those paragraphs when I signed it.  So it

17 was not my intent to go any further than my equity was my

18 equity and his was is.  And his was still in the house.

19     Q.   Were you aware that the Cadle Company executed a

20 writ of garnishment on Mr. Cadle's (sic) Merrill Lynch

21 account in July of '07?

22     A.   Mr. Riggert's?

23     Q.   I'm sorry, Mr. Riggert's.

24     A.   Okay.  Say that again.

25     Q.   Were you aware that the Cadle Company had a writ of

1    garnishment served on the Merrill Lynch account owned by

2    Mr. Riggert?

3         A.   Yes.

4         Q.   Okay.  Did that make you fearful that the Cadle

5    Company might try to get the money in your account?

6         A.  I was not focused on the Cadle Company.  I was

7    focused on paying Emily Riggert's tuition bill, Hannah

8    Riggert's tuition, and our living expenses.  That was my

9    total focus.

10        Q.   Thank you.

11        A.   You're welcome.

12             MR. LAUN:  No more questions, Your Honor.

13             THE COURT:  Redirect?

14                  REDIRECT EXAMINATION

15   BY MS. BARTHOLOW:

16        Q.   Ms. Riggert, one last question.

17        Mr. Laun just asked you if you had any debt owed to the

18   Cadle Company.

19        Are you aware of any debt --

20        A.   None whatsoever.  I didn't hear him say that.  I'm

21   sorry if I missed that.

22        Q.   Okay.  And do you understand what the basis is for

23   the MBank judgment against your husband?

24        A.   Yes.

25        Q.   What was it?

1     A.   I believe it was a real estate investment.

2     Q.   Okay.  Were you part of that real estate --

3     A.   I was not part of that real estate investment, no.

4 It was Jim Riggert.

5     Q.   Okay.  Was that an investment that he made prior to

6 marriage?

7     A.   No.

8     Q.   Okay.  But that was part of his business, that was

9 not you?

10    A.   Correct.

11    Q.   Thank you.

12         MS. BARTHOLOW:  No further questions.

13         THE COURT:  All right.  Any recross?

14         MR. LAUN:  None, Your Honor.

15         THE COURT:  Okay.  Thank you, Mrs. Riggert.

16 You're excused.

17    All right.  Ms. Bartholow, any other evidence today?

18         MS. BARTHOLOW:  I don't believe so, Your

19 Honor.  I think this is -- despite our inability to agree on

20 the exact wording of the facts, I think we do agree what

21 happened happened.  And what the documents say they say.

22         THE COURT:  All right.  Well let me go through

23 this.

24    The defense has rested, as I hear it.

25    Do you have any rebuttal?

1                    MR. LAUN:  We close.

2                    THE COURT:  Okay.  I'll hear very brief

3    closing arguments.

4                    MR. LAUN:  Two minutes.

5                    THE COURT:  That would be great.

6                    MR. LAUN:  Your Honor, we think that we've

7    carried our burden under our 727(a) claims.  And we have

8    developed and proven all of the elements.

9         The testimony is just not credible or believable of

10   Mr. Riggert as to what they put together this agreement some

11   three months -- two and a half months after the closing of

12   the house of the refinance in which they come along and say,

13   Okay.  Let's set up a scheme where we can set aside some

14   money.  And let's divide our homestead into separate estates.

15   They don't do that with any kind of a deed or anything.  They

16   just do that with this homestead refinancing agreement, which

17   suggests that Mr. Riggert is somehow going to get some more

18   money out of the homestead than his spouse is because she did

19   the latest refinance.

20        But the whole problem that we've had with the case is

21   why couldn't this have been put on the schedules and

22   statement of affairs?  I mean, in the over abundance of

23   caution, why wouldn't someone list that?  And then after the

24   adversary was filed, why wouldn't you amend?  Why wouldn't

25   you cut the legs off of our allegation that you didn't reveal

on the schedules, the sworn schedules and statement of
affairs?  That -- that notion that I don't have to, that this
is something that I have set aside this money to my spouse
and I don't have to tell the Bankruptcy Court about it.  Oh,
yes, this creditor knew about it.  Sure we knew about it
after we got the copy in November and they filed in January.
And, sure, we questioned them about it at the 341 Meeting.
But then the arrogance that we don't have to supply the
Bankruptcy Court with accurate sworn schedules and statement
of affairs, there's a notion there that they don't have to
play by the rules.

    What is the real purpose of this agreement?  I think
the testimony that you heard is convoluted.  For the life of
me I can't figure out why anybody would enter into this,
except that they thought that Cadle was on the trail of
getting -- somehow was going to execute on this $65,000
before they had a chance to spend it.  That's the real
motive.  And that's the hindering and delaying of the
creditors.

    The concealment is they got the money June 29th when
they closed.  They did this home financing in September.  But
they didn't record it until October 26th.  And then they
didn't supply it to us until November.  Granted, we should
have been checking the real estate records for such documents
routinely.  But that's the part of the deception that

1  troubles the plaintiff in the case. That there is an -- and,

2  of course, by then, I think the testimony has pretty well

3  been shown that they've already spent the money by that time.

4  But I think there was a real fear on their part that Cadle

5  was about to garnish this 65,000 once they found out about

6  the 65,000, in fact, had been paid at a closing. Of course,

7  we knew about the closing, but we didn't know how much money

8  was being -- the excess. That was kept from us.

9      But this idea that this -- a person who is a real

10 estate agent can sit on the witness stand and say, I really

11 don't understand the import of the agreement and what the

12 agreement really meant and, gee, I don't know, I'll need to

13 ask a lawyer, that makes my stomach a bit upset. And I

14 believe that shows an indication that this debtor is not

15 playing with the truth and that there's been representations

16 made both in the schedules and statement of affairs that it's

17 material and that we have proven every element of our 727

18 complaint, Your Honor.

19      THE COURT: All right. Thank you.

20 Ms. Bartholow.

21      MS. BARTHOLOW: Thank you, Your Honor.

22      I don't think there's any intent to not disclose this

23 transaction. I don't think that Cadle can say they weren't

24 aware of all of the transaction. They have already stated in

25 other pleadings in this case that they received the closing

statement. They're on the closing statement. They knew that
Mrs. Riggert got the money. Their own exhibit shows the wire
information. The Riggerts did do an agreement. Whether they
needed to or not, they did. They filed it of record. That's
the only testimony. Mr. Riggert has testified when he was
talking to Mr. Savet at the beginning he told them that there
was going to be $60,000, about, that was going to go to
Mrs. Riggert.

I don't see an intent to deceive at all. If there was
an intent to deceive, they certainly wouldn't have filed
something in the deed records showing, Look, we're dividing
our equity. I think the only evidence is, is that's what
they thought they were doing. They were dividing equity in
an exempt asset.

There wasn't a transfer of Mr. Riggert's asset to
Mrs. Riggert. There wasn't a transfer to tell the Court
about. It was a receipt of equity out of the home which was
an exempt asset that creditors could never reach. Only if
they sold their house and sat on the proceeds for six months
could a creditor ever reach the home proceeds. This was
designed to make it clear to anyone who looked that, yes,
they had -- Mrs. Riggert had taken her equity out.

If it was a defensive move in some way dealing with
Cadle, I don't know. I didn't do that document. They were
not saying that that's what it was. But it's of record. It

1    can't be said that it was designed not to disclose.

2          I think for the contingencies that Mr. Laun has pointed

3    out -- the movants say they're not there.  They're there.

4    But were they real in the sense of the debtor's concept of

5    how this would play out?  And the answer is, No.  They never

6    expected that there wouldn't be the equity there to pay

7    Mr. Riggert, or to allow him to take his equity.  Even if he

8    took his equity, it's still exempt for six months.  And

9    they've got to have a home.

10          They have shown the Court in their schedules that they

11    don't have assets.  If you look at them, they are one of the

12    lowest asset collection of people that you normally see.

13    This is an extremely modest household.  And perhaps in part

14    because Cadle has done their job in collecting.  Because we

15    disclosed that Cadle got it, at least almost $14,000 in the

16    year before they filed.  And that's undisputed.  So, you

17    know, these people couldn't build up a lot of assets.

18    Frankly, I don't know why they didn't file bankruptcy many,

19    many years ago.  But they didn't.  And they're here now.  And

20    the question is, at what point in time does somebody finally

21    get a discharge from Cadle?  Cadle is claiming that these

22    people owe them more than a million dollars.  And at age 55

23    and 52 with this financial statement, there's no way these

24    people are ever going to earn a million dollars.

25          So, again, did they go through this whole thing with a

1   design to keep from the Court, to keep from the public, or to

2   keep from Cadle a transaction that would render an asset to

3   the creditors.  And we say, no.  It wasn't designed to do

4   that.  It didn't do that.  The contingencies were so remote

5   that they're not material, in our view.  And there wasn't a

6   transfer of an asset that belonged to Mr. Riggert.

7          So, you know, I just don't see how Cadle can say that

8   this was designed to cheat them in any way, shape, or form or

9   the other creditors.  It was discussed at the 341.

10         Now, I've read the Cadle cases.  And Mr. Laun says, Why

11  didn't you amend?  Part of the reason is in every case where

12  there is an amendment, Cadle comes in and says, See, they

13  lied the first time and they knew it.  Now they're amending

14  and that proves that there was a false oath.  You're kind of

15  damned if you do and damned if you don't.  We didn't list the

16  homestead agreement, because we didn't believe it was an

17  asset available to the creditors or a transfer that needed to

18  be reported.  If that was a mistake, then it's probably my

19  mistake and not my client's.  And because there -- you know,

20  the debt itself is there.  The fact that there was a transfer

21  to Cadle is there.  There was no intent to hide anything.

22  And if, in fact, this was a re-arrangement of the equities in

23  exempt property, then there was nothing to report and that's

24  the way we viewed it.

25                  THE COURT:  Thank you.

1          MS. BARTHOLOW:  Thank you.

2          THE COURT:  All right.

3          MR. LAUN:  Can I have 45 seconds just for

4   rebuttal?

5          THE COURT:  45 seconds.  I have a feeling I

6   know what you're going to say.  Loan proceeds exempt, not

7   exempt.

8          MR. LAUN:  Yes.  That was my -- we had filed a

9   trial brief about that, about the constitution and the

10  property code clearly states that sales doesn't address

11  refinancing where you pull this equity out.  So it's perhaps

12  a novel issue.  I haven't been able to find anything on it.

13       I did want to say one last thing.  And it's kind of a

14  red flag whenever the debtor characterizes themselves as

15  modest.  They live in a $662,000 house.  It just is troubling

16  to me that that now has become a modest debtor.  We move for

17  judgment.

18         THE COURT:  All right.

19         MS. BARTHOLOW:  Your Honor, may I respond to

20  the issue just brought up?  Not the home value, but the --

21  whether the proceeds are exempt or not.

22         THE COURT:  Just very briefly.

23         MS. BARTHOLOW:  I think it's an interesting

24  issue.  I'm not sure that it controls this case.  Because

25  even if we took the assumption, which I don't, that they're

1  not exempt, then we're definitely under sole management and

2  control of the spouse who owed nothing to Cadle.  And she is

3  allowed to have her sole and only property.  I think that's

4  what Trammel says.  I think that's what Mayhat says.  I think

5  it's a non-issue.

6            THE COURT:  Okay.  Thank you.

7       All right.  It's 9 minutes after 12.  I'm going to come

8  back at 12:30 and rule.  So we're in recess for 21 minutes.

9            (Brief recess ensued.)

10            THE COURT:  Okay.  We're back on the record in

11  the Cadle Company v. Riggert.  Adversary 08-3165.  The Court

12  has been deliberating.  I apologize for my inaccurate time

13  estimate.  I tend to do that sometimes.

14       Before this Court is, of course, the adversary

15  complaint objecting to discharge brought by the Cadle

16  Company, as well as the debtor's answer to that complaint.

17  This Court has jurisdiction of this matter pursuant to 28 USC

18  Section 1334.  And this is a core proceeding pursuant to 28

19  USC Section 157(b).

20       Cadle narrowed the issues at trial to whether

21  Mr. Riggert's discharge should be denied pursuant to either

22  or both Sections 727(a)(2)(A) and/or 727(a)(4) of the

23  Bankruptcy Code.

24       This oral bench ruling constitutes the Court's findings

25  of fact and conclusions of law pursuant to Federal Rule of

Bankruptcy Procedure 7052. The Court reserves the right to supplement or amend these findings as it deems necessary or appropriate.

The Court finds that the debtor filed a Chapter 7 Bankruptcy petition on January 31st, 2008. The debtor is a licensed real estate agent in Texas. He is approximately 55 years old. The debtor's wife, Lisa, and he have been married since 1981. The debtor's wife is not a debtor in bankruptcy. Ms. Riggert is an interior designer and also has a wage earning job at St. Michael's Women's Exchange.

The debtor's statement of financial affairs at questions 1 and 2 show that Mrs. Riggert has earned her own income in the years leading up to Mr. Riggert's bankruptcy filing. The credible testimony was that the debtor and Mrs. Riggert have maintained separate accounts for much or most of their marriage. Also, the credible testimony was that the debtor and his wife have nominal retirement funds, as shown on the debtor's schedules. And that their primary wealth is their homestead. It's specifically whatever equity they have in their homestead.

Plaintiff, Cadle, claims to be an unsecured creditor of the debtor and the owner of a judgment claim against the debtor. Debtor's Schedule F shows that Cadle has stated an unsecured claim of $1,214,000 as of the bankruptcy petition date. Mrs. Riggert is not obligated to Cadle.

 1    The central transaction at the heart of this adversary
 2 proceeding involves the debtor and his wife's homestead and
 3 is as follows.  The debtor and his wife own a homestead at
 4 6622 Northport in Dallas, Texas, which the debtor listed on
 5 his Schedule A in his bankruptcy case showing a secured claim
 6 against it of $491,000 and an estimated value of $700,000.
 7    The debtor and his wife have lived at the home since
 8 1983.  The debtor's $700,000 valuation was based on what an
 9 appraiser had determined the value to be in connection with
10 the refinancing of the home that occurred or closed in July
11 of 2007.  With regard to this refinancing the credible
12 evidence was that in or about July 2007 Mrs. Riggert
13 refinanced the homestead with Countrywide.  Mrs. Riggert
14 received $65,864 at the closing of that refinancing
15 representing the cash from the equity in the home, or some of
16 the equity in the home.  Cadle received $5,000 cash from the
17 equity refinancing that otherwise might have gone to debtor
18 or Mrs. Riggert.
19    Exhibit 11 at trial was the closing settlement
20 statement from the home refinancing and it shows that Cadle
21 received a payoff of $5,000 from refinancing proceeds in
22 exchange for a partial release from Cadle.
23    The credible testimony was that the purpose of the
24 Countrywide home equity loan, I keep calling it home equity
25 loan, home loan was to obtain funds to pay the debtor and his

wife's daughter's school tuition at Trinity University, as
well as the younger daughter's private high school tuition.

The debtor has worse credit than his wife, at least
partially because of Cadle, and so Mrs. Riggert qualified for
a loan easier.  The debtor and Mrs. Riggert had other family
bills and no way to pay them.  The loan proceeds were used
for living expenses and none of the loan proceeds remain in
Mr. Riggert's account.

Related to this whole home refinancing transaction on
or about September 4th, 2007 the debtor and Mrs. Riggert
signed a document entitled, Homestead refinancing agreement.
This was Trial Exhibit 1.  The agreement recited that it was
executed on September 4th, 2007, but to be effective on June
29th, 2007.

The unrefuted testimony was that the purpose was to
clarify in writing what the couple's agreement was and put it
in the deed records, specifically that Mrs. Riggert was
getting the equity proceeds as her sole and separate
property.  The unrefuted testimony was that the agreement,
again, was filed in the deed records and that it was produced
to Cadle before Mr. Riggert's bankruptcy filing.

The agreement purported to segregate to Mrs. Riggert as
her sole and separate property the sum of $65,864.49
representing cash from the refinancing of the home, except
for the 5,000 in cash that went to plaintiff.  The agreement

further provided that the debtor would be paid the amount of
$65,864 upon the sale or refinancing of the home after
repayment of certain listed items.  But in the event the
gross sale proceeds from a future home sale were not
sufficient to pay debtor $65,864, the agreement required
Mrs. Riggert to pay debtor $65,864 from her sole and separate
property in 120 equal payments with 6 percent interest per
annum.

The debtor did not list the existence of this agreement
with his wife in his sworn schedules and statement of
financial affairs.  And those schedules and statement of
financial affairs have not been amended since their filing.

Mr. Riggert testified that he did not consider the
$65,864 amount referred to in paragraphs 3 and 4 of the
agreement with his wife as an account receivable.  It was
contingent, could be owed one day.  But he did not think he
needed to list it in Schedule B because there was no
promissory note or no current obligation to pay.  The intent
was to identify the couple's separate property.  A lawyer
drafted it for him and he did not really know if it
constituted an enforceable obligation.  He views it as
follows.  My equity is still in the home, but my wife got her
equity out already.

The debtor reiterates that he never saw the money,
i.e., the $65,864 that was obtained from the refinancing in

1  July '07 that went to the wife as her separate property.  And

2  the evidence corroborated that this $65,000 went to

3  Mrs. Riggert's JP Morgan account over which the debtor had no

4  signing authority.

5      The further evidence was that a large portion of the

6  money went to pay Trinity and that the remainder was put in

7  Mrs. Riggert's Merrill Lynch separate account.

8      The evidence further was that Cadle had garnished the

9  debtor's own Merrill Lynch bank account in August 2007.

10     Now, Cadle objects to the debtor's discharge because of

11  this $65,000 transaction not being disclosed in his

12  schedules, not being in Schedule B, not being in the

13  statement of financial affairs at question 3, or 10, et

14  cetera.  To be clear the potential errors identified in the

15  debtor's schedules and statement of financial affairs at

16  trial were; one, the failure to list the agreement with Mrs.

17  Riggert in Schedule B, or a contingent accounts receivable

18  from

19  Mrs. Riggert in Schedule B; two, the failure to list a

20  payment to the wife, or a transfer to the wife in questions 3

21  and 10 of the statement of financial affairs, and

22  additionally, a failure to list Mrs. Riggert as the debtor's

23  spouse in question 16 of the statement of financial affairs.

24     Cadle also objects to discharge arguing that there was

25  within one year before the bankruptcy filing a transfer or

1 concealment of property of the debtor with intent to hinder

2 or deceive Cadle.

3       The potential evidence of concealment at trial was

4 Exhibit 12, personal financial statements supplied by debtor

5 to Cadle in August 2007.  Cadle complains that it did not

6 know of the agreement with the wife in connection with the

7 refinancing.  Also evidence of concealment, the fact that the

8 agreement Between Mr. and Mrs. Riggert was not executed until

9 September 2007, and not supplied to Cadle until November

10 2007.  Also Cadle argues the overall nature of what happened

11 was an effort to thwart Cadle's collection efforts.

12       The debtor's primary defense is that essentially the

13 total intent here was to get the debtor and his wife's bills

14 paid, not an intent to thwart Cadle.  The debtor also

15 credibly testified that if the couple ever sells their house,

16 they would intend to buy another house and roll his equity

17 into a new house.  The debtor did not view his wife as really

18 having an indebtedness as to him that would have to be paid

19 one day.  He never envisioned the scenario where Mrs. Riggert

20 would owe him money because of the value of the house.

21       The testimony, finally, was that the debtor and his

22 wife had separate incomes for a long time and have long

23 operated as though they have his and her separate property.

24       Based on all of the totality of evidence here, the

25 Court concludes that the debtor is entitled to his discharge.

1    The homestead refinancing agreement was not entered into for

2    the purpose of defrauding creditors and the debtor did not

3    conceal the transaction.  The omissions from the debtor's

4    schedules were not material.

5         In order to establish that a debtor's discharge should

6    be denied pursuant to Section 727(a)(2)(A) the moving

7    creditor must show; one, a transfer or concealment of

8    property; two, belonging to the debtor; three, within one

9    year of the filing of the bankruptcy petition; and, four,

10   with intent to hinder, delay, or defraud a creditor.  The

11   intent to defraud must be actual, not constructive.  But

12   actual intent may be inferred from the actions of the debtor

13   and may be proven by circumstantial evidence.

14        Here the Court does not find an intent that is required

15   to deny the discharge under 727(a)(2)(A).

16        Now, in order to make a showing under 727(a)(4), the

17   plaintiff must show; one, that the debtor made a statement

18   under oath; two, that the statement was false; three, that

19   the debtor knew the statement was false; four, that the

20   debtor made the statement with fraudulent intent, and; five,

21   the statement related materially to the bankruptcy case.

22        Again, the Court does not believe materially false

23   statements were made here, nor was there required intent on

24   the part of the debtor.  The Court, also, does not believe

25   there was any reckless disregard for the truth.

1    The Court relies on, among other cases, the in re Pratt

2    case, 411 F.3d 561, 5th Circuit 2005, as well as many other

3    cases that the Court will not bother to cite here.

4    So the debtor's discharge shall be granted.  The

5    objections of Cadle are overruled.

6    And, Ms. Bartholow, I'm going to look to you to upload

7    a form of judgment consistent with this Court's oral ruling.

8    The Court is not going to insist you draft lengthy findings

9    and conclusions.  I'd ask that you simply cross-reference the

10   Court's oral findings, or perhaps attach a transcript.  But

11   if you want to take a stab at doing detailed findings and

12   conclusions, the Court will certainly consider signing off on

13   that type of thing.

14   Now the Court understands that counsel have agreed to

15   bifurcate the issue of attorney's fees.  I'm just going to

16   say right off the bat that I'm not aware of any authority

17   that allows the debtor to get attorney's fees reimbursed,

18   unless a Rule 11 motion was properly made.  But I will

19   certainly look at any authority you want to submit to me in

20   that regard, Ms. Bartholow.

21   All right.  Well, I thank you all for your very

22   organized and concise presentations here today.  I thank you

23   all for doing the joint pre-trial order.  We don't always

24   have that cooperation and the Court appreciates it when it

25   happens.

1          Are there any housekeeping matters?

2                    MR. LAUN:  No, Your Honor.

3                    MS. BARTHOLOW:  No, Your Honor.

4                    THE COURT:  Okay.  Thank you.  We stand in

5    recess.

6                    (End of Court's Ruling.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            <u>C E R T I F I C A T E</u>

2        I, CINDY SUMNER, do hereby certify that the

3  foregoing constitutes a full, true and complete transcription

4  of the proceedings as heretofore set forth in the

5  above-captioned and numbered cause in typewriting before me.

6

7

8

9

10

11

12

13

14                      /s/Cindy Sumner

                                _____

15                      CINDY SUMNER, CSR #5832

                                Expires 12-31-09

16                      National Court Reporters

                                16 Gettysburg Lane

17                      Richardson, Texas 75080

                                214 651-8393

18                      Firm #417

19

20

21

22

23

24

25